UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ASMI AUTO INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | |
| EXECUTIVE AMBULATORY SURGICAL CENTER, LLC; THE SURGICAL INSTITUTE OF MICHIGAN, LLC; JIAB SULEIMAN D.O., P.C.; RAKESH RAMAKRISHNAN, M.D., P.C.; NEW CLEAR IMAGES, LLC; BIOMOLECULAR INTEGRATIONS, INC.; JIAB SULEIMAN, D.O.; and RAKESH RAMAKRISHNAN, M.D., | **Demand for Jury Trial** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.      <u>INTRODUCTION</u>

1.      This is a case about medical clinics, ambulatory surgery centers, a magnetic resonance imaging ("MRI") facility, a drug testing laboratory, and their owners, managers, agents, and representatives who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.      Defendants Executive Ambulatory Surgical Center, LLC ("EASC"), The Surgical Institute of Michigan, LLC ("SIM"), Jiab Suleiman D.O., P.C. ("Suleiman P.C."), Rakesh Ramakrishnan, M.D., P.C. ("Ramakrishnan P.C."), New Clear Images, LLC ("New Clear"), Biomolecular Integrations, Inc. ("Biomolecular Integrations"), Jiab Suleiman, D.O. ("Suleiman"), and Rakesh Ramakrishnan, M.D. ("Ramakrishnan") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance fraud scheme in violation of federal and state law.

3.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

4.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.      As a result of the defendants' fraudulent acts, Allstate has paid in excess of $2,240,264 to them related to the patients at issue in this Complaint.

## II.    THE PARTIES

### A.    PLAINTIFFS

7.      Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and ASMI Auto Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.      Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and ASMI Auto Insurance Company have their respective principal places of business in Northbrook, Illinois.

9.      At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

B.      **DEFENDANTS**

1.      **Executive Ambulatory Surgical Center, LLC**

10.      Defendant Executive Ambulatory Surgical Center, LLC is a limited liability company organized under the laws of the State of Michigan.

11.      EASC's members are Samer Suleiman, Lucia Zamorano, M.D., and Ramakrishnan, each of whom is a citizen of the State of Michigan.

12.      At all relevant times, EASC was operated and conducted by defendants Suleiman P.C., Ramakrishnan P.C., New Clear, Suleiman, and Ramakrishnan.

13.      EASC billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

2.      **The Surgical Institute of Michigan, LLC**

14.      Defendant The Surgical Institute of Michigan, LLC is a limited liability company organized under the laws of the State of Delaware.

15.    SIM was authorized to do business in Michigan on January 28, 2009 using the assumed name of The Surgical Institute of Michigan Ambulatory Surgical Center, LLC.

16.    SIM's members are Suleiman, Mohammad Jaura, Mohammad Awaisi, M.D., Firoza Van Horn, Psy.D., Muzammil Ahmed, M.D., Mohammed Arman, M.D., Kevin Crawford, D.O., Mahmood Hai, M.D., Vijay Kotha, M.D., Nilesh Patel, M.D., and Raj Rajaramin, M.D., each of whom is a citizen of the State of Michigan; Angelo Sorce, M.D., who is a citizen of the State of Tennessee; and Apex Surgical Center, LLC, an Arizona limited liability company.

17.    Apex Surgical Center, LLC's members are Virtuous Management Group, LLC and Advanced Health and Wellness AZ, PLLC.

18.    Upon information and belief, Virtuous Management Group, LLC's members are Eric Poole and Katherine Poole, both of whom are citizens of the State of Arizona.

19.    Upon information and belief, Advanced Health and Wellness AZ, PLLC's member is Justin Lecompte, who is a citizen of the State of Arizona.

20.    At all relevant times, SIM was operated and conducted by defendants Suleiman P.C., Ramakrishnan P.C., Suleiman, and Ramakrishnan.

21.    SIM billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 2.

### 3.    Jiab Suleiman D.O., P.C.

22.    Defendant Jiab Suleiman D.O., P.C. is a professional corporation incorporated under the laws of the State of Michigan.

23.    Suleiman P.C.'s principal place of business is in Dearborn Michigan.

24.    Suleiman P.C. uses the registered fictitious names Premier Orthopedics, Premier Med Services, and Premier Pharm.

25.    At all relevant times, Suleiman P.C. was operated and conducted by defendants Suleiman, EASC, SIM, New Clear, and Biomolecular Integrations.

26.    Suleiman P.C. billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 3.

### 4.    Rakesh Ramakrishnan, M.D., P.C.

27.    Defendant Rakesh Ramakrishnan, M.D., P.C. is a professional corporation incorporated under the laws of the State of Michigan.

28.    Ramakrishnan P.C.'s principal place of business is in Dearborn Michigan.

29.    At all relevant times, Ramakrishnan P.C. was operated and conducted by defendants Ramakrishnan, EASC, and SIM.

30.    Ramakrishnan P.C. billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 4.

### 5.    New Clear Images, LLC

31.    Defendant New Clear Images, LLC is a limited liability company organized under the laws of the State of Michigan.

32.    New Clear's member is Manoul Brikho, who is a citizen of the State of Michigan.

33.    At all relevant times, New Clear was operated and conducted by defendants Suleiman P.C. and Suleiman.

34.    New Clear billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 5.

### 6.    Biomolecular Integrations, Inc.

35.    Defendant Biomolecular Integrations, Inc. is a corporation organized under the laws of the State of Arkansas.

36.    Biomolecular Integrations was authorized to do business in Michigan on May 4, 2021.

37.     Biomolecular Integrations's principal place of business is located in Sherwood, Arkansas.

38.     At all relevant times, Biomolecular Integrations was operated and conducted by defendants Suleiman P.C. and Suleiman.

39.     Biomolecular Integrations billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 6.

### 7.     Jiab Suleiman, D.O.

40.     Defendant Jiab Suleiman, D.O. is a resident and citizen of the State of Michigan.

41.     At all times relevant to this Complaint, Suleiman owned and controlled defendant Jiab Suleiman D.O., P.C.

42.     At all relevant times, Suleiman operated and conducted defendants Suleiman P.C., EASC, SIM, New Clear, and Biomolecular Integrations.

### 8.     Rakesh Ramakrishnan, M.D.

43.     Defendant Rakesh Ramakrishnan, M.D. is a resident and citizen of the State of Michigan.

44.     At all times relevant to this Complaint, Ramakrishnan owned and controlled defendant Rakesh Ramakrishnan, M.D., P.C.

45.    At all relevant times, Ramakrishnan operated and conducted defendants Ramakrishnan P.C., EASC, and SIM.

## III.    JURISDICTION AND VENUE

46.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

47.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

48.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

49.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

50.    The defendants used the RICO enterprises identified herein – EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, and Biomolecular Integrations – to submit exorbitant charges to Allstate for purported medical services, procedures, testing, and medications that were not actually provided, were not medically necessary, and were fraudulently billed.

51.     The purpose of the scheme was to generate the highest possible amount of charges to Allstate to abuse the Michigan No-Fault Act.

52.     The defendants are all interrelated, and utilized Suleiman P.C. and Ramakrishnan P.C. (collectively, the "defendant clinics") both to generate bills for medically unnecessary services and to direct patients to the other RICO enterprises for medically unnecessary treatment and testing.

53.     The fraudulent scheme described herein was driven by Suleiman and Ramakrishnan, who implemented predetermined treatment protocols at the defendant clinics that included aggressively billing for medical services that were unnecessary and unsupported by standards of care and patient conditions and referrals of patients to the other defendant entities for unnecessary and fraudulent medical treatment and services.

54.     The defendants' predetermined treatment protocol included frequent, excessive, and unnecessary office visits during which the defendants made non-specific diagnoses in order to create the appearance of necessity of treatment billed to Allstate, and which were fraudulently billed to Allstate as described below.

55.     This protocol also included orders for extensive physical therapy without regard to whether such treatment benefitted patients, prescriptions for numerous medications purportedly intended to address non-specific complaints of pain, frequent orders for imaging, urine drug screens, and other testing that was not

warranted by the medical record, and recommendations for pain management injections and procedures made without regard to patients' actual conditions or clinical diagnoses.

56.     That the defendant clinics' orders for medical services were motivated by financial gain rather than medical necessity is further evidenced by their routine orders for experimental and medically unnecessary durable medical equipment ("DME") from suppliers whom other physicians have admitted make payments, which in reality are thinly concealed kickbacks, in exchange for such prescriptions.

57.     For example, defendant Suleiman routinely ordered pulsed electromagnetic field devise from a company called OrthoCor Medical, Inc., which enters into "practice management" contracts with providers in Michigan and pays them tens of thousands of dollars in exchange for prescriptions.

58.     When asked to provide a medical basis for ordering these devices, Suleiman P.C. responded with citations pertaining to laser therapy, which is a completely different modality and evidences that the OrthoCor devices were only ordered to obtain the cash payment offered by OrthoCor Medical, Inc.

59.     Similarly, defendant Ramakrishnan routinely ordered DME from Gray Medical, LLC, which has shared bank accounts with physicians in Michigan that are used to compensate such physicians for prescribing DME.

11

60.    Ramakrishnan admitted during deposition testimony that he has prescribed DME devices without actually knowing what they do:

```
Q.    How is it different than a TENS unit?
A.    I do not know but I plan to find out.
Q.    So did you prescribe one for her?
A.    Yes.
```

61.    Much of the DME unnecessarily ordered by the defendants was stored at defendant EASC and distributed to patients by EASC, which then arranged for the DME to be billed under the names of the suppliers.

62.    In some cases, DME distributed pursuant to this arrangement resulted in Allstate being billed twice for the same purported equipment.

63.    The defendants also arranged for their associates to bill for services that had absolutely no medical necessity in order to further multiply charges for routine procedures.

64.    For example, EASC and Ramakrishnan P.C. frequently claimed to have intraoperative neuromonitoring ("IONM") billed in conjunction with their routine procedures.

65.    IONM, when done properly, is a technical electrodiagnostic monitoring process used in complex spinal surgeries for patients with significant injuries or comorbidities to ensure they are not further injured during the surgical procedure.

66.     The defendants arranged for IONM to be performed for procedures so brief and routine that the physicians and technicians who allegedly did the testing found it laughable.

67.     The following is an excerpt from a "chat record" between a technician who was in the operating room and a physician who was allegedly remotely monitoring the readings from a different location, for a procedure billed by EASC and Ramakrishnan P.C.:

| 11:58 | Fanelli, J. | broder, s. | **Event**: closing |
|---|---|---|---|
| 11:58 | broder, s. | Fanelli, J. | what? |
| 11:59 | Fanelli, J. | broder, s. | were closing |
| 11:59 | Fanelli, J. | broder, s. | **Event**: discectomy occured at approximately 1145 |
| 11:59 | broder, s. | Fanelli, J. | yeah...that's what I thought you said |
| 11:59 | Fanelli, J. | broder, s. | lol |
| 11:59 | Fanelli, J. | broder, s. | i dont know why he asked me to do this case lol |
| 11:59 | broder, s. | Fanelli, J. | Closing: SSEP, and EEG were all consistent throughout the surgery. No significant changes occurred |
| 12:00 | broder, s. | Fanelli, J. | great!!! |
| 12:00 | broder, s. | Fanelli, J. | Dont ask him....!! |
| 12:00 | Fanelli, J. | broder, s. | Thanks, ill text you before the next one! |
| 12:00 | broder, s. | Fanelli, J. | ok |
| 12:00 | Fanelli, J. | broder, s. | lol i didn't |
| 12:00 | broder, s. | Fanelli, J. | cool |

68.     As a similar part of the predetermined treatment protocol to generate bills for services that were completely unnecessary, the defendants unnecessarily utilized EASC's and SIM's surgical facilities for routine pain management injections and other procedures that can and should have been performed in an office setting, thereby multiplying the amount charged and permitting EASC and SIM to submit separate facility fees to Allstate for such purported treatment.

13

69.     The defendants also worked with third parties with a long history of fraudulent conduct to obtain patients and generate additional billing.

70.     For example, Suleiman, Suleiman P.C., EASC, and SIM all are associated with Muhammad Awaisi, M.D. ("Awaisi") and several entities he owned and controlled, including an entity known as Orthopedic P.C., against whom Allstate has a judgment it obtained in litigation alleging a comprehensive fraudulent scheme to submit claims under Michigan's No-Fault Act for alleged medical services that were not actually provided and that were unlawful, unreasonable, and unnecessary similar to the practices at issue in this case.

71.     Around the time Orthopedic P.C. and Awaisi agreed to a settlement of Allstate's claims, on which they subsequently defaulted, they arranged to transfer all of Orthopedic P.C.'s patients to Suleiman and Suleiman P.C.

72.     The correspondence from Awaisi to Suleiman regarding the transfer of these patients directs Suleiman to await instructions from Mohammad Jaura ("Jaura"), who is the majority owner of SIM, who would tell Suleiman what entity to use to bill treatment for such patients to conceal from Allstate the associations between these providers.

73.     Awaisi is currently under federal criminal indictment for fraud in a scheme that involved creating fake medical diagnoses and unlawful distribution of

controlled substances.  *See* <u>United States of America v. Muhammad Awaisi, *et al.*</u>, 21-cr-20295-AJT-DRG (E.D. Mich.).

74.    While Jaura holds himself out as the majority owner of SIM, in reality he has entered into agreements with Awaisi and Firoza Van Horn, Psy.D. ("Van Horn"), who was also indicted in relation to the same scheme as Awaisi, through which they share ownership of the Jaura share and agree that Jaura's wife, Nusrat Jaura, controls its operations.

75.    Allstate's investigation also uncovered extensive evidence of the defendants' interrelationships.

76.    For example, Suleiman P.C., EASC, and New Clear are located in different suites at the same address, which is a property that is owned and controlled by Suleiman's brother, Samer Suleiman, who is also the former manager of Suleiman P.C. and is an owner and the current manager of EASC.

77.    Suleiman and Suleiman P.C. direct patients to New Clear for MRIs, a practice that is demonstrated by the fact in 2019, before New Clear began operating the MRI location, only one (1) of 797 MRIs ordered by Suleiman that year were billed by the predecessor to New Clear in the same location, while in 2020, after New Clear began its (unlicensed) operation of the MRI location, 348 MRIs ordered by Suleiman were billed by New Clear.

78.     Allstate has obtained sworn testimony from a patient solicitor in Michigan that New Clear, which the patient solicitor identified by providing its exact street address, pays kickbacks in exchange for patient referrals, which explains the massive increase in prescriptions by Suleiman that were allegedly performed by New Clear.

79.     Correspondence sent by indicted physician Awaisi confirms that defendant Suleiman controls operations of EASC, including the credentialing of physicians who utilize the EASC surgical suite to generate charges to Allstate, as Awaisi arranged for several of his associates to be granted privileges on short notice to bill for unnecessary procedures.

80.     Suleiman also is a member of SIM and exercises control over its operations, including physician credentialing.

81.     Jaura's wife, Nusrat Jaura, who controls the operations of SIM, is also the Michigan resident agent of Biomolecular Integrations.

82.     Billing for both SIM and Biomolecular Integrations is prepared by Priya Vannoy ("Vannoy"), who owns A2Z RCM, LLC.

83.     Vannoy regularly corresponded with both Jaura and Awaisi about billing issues pertaining to SIM and Biomolecular Integrations.

84. As detailed below, the purported urine drug testing for which Biomolecular Integrations billed Allstate was almost exclusively ordered by Suleiman P.C. and associates of the defendants.

85. As a result of their relationship and shared control, the defendants and their associates had a significant financial motivation to bill Allstate for as many services, testing, procedures, and medications as possible, all at unconscionable rates and regardless of medical need and applicable standards of care.

86. The defendants' bills and associated records were sent to Allstate through faxes over interstate wires and the U.S. Mail, and Allstate relied on the faxes and mailings sent by the defendants in adjusting and paying insurance claims.

## V.    BILLING FOR SERVICES NOT RENDERED

87. The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

88. The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

89. All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

90.     Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## A.     BILLING FOR SURGERIES NOT PERFORMED

91.     The defendants routinely billed for surgeries and components of surgeries that were not actually performed and concealed this fact from Allstate through the use of esoteric billing codes and modifiers.

92.     For example, Ramakrishnan, P.C. billed Allstate for a purported spinal surgery to patient S.D. (Claim No. 043060190)[1] on January 26, 2018 using eight (8) separate Current Procedural Terminology ("CPT")[2] codes.

93.     Several of the CPT codes billed by Ramakrishnan, P.C. relative to this surgery were for the alleged performance of a vertebral corpectomy (in addition to codes describing arthrodesis, instrumentation, and insertion of a cage), which is only proper to bill when the procedure involves removal of more than 50% of a patient's cervical vertebrae.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.

[2] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

94.    The claimed procedure to S.D. did not involve removal of anywhere near 50% of her cervical vertebrae; at most it involved using a burr to shave off millimeters of bone from the endplates of two vertebrae.

95.    The bills that claimed that corpectomies were performed were false and were for services that were not provided to S.D. at all.

96.    As another example, Suleiman, P.C. and SIM billed for an alleged shoulder surgery to patient A.S. (Claim No. 0394083943) on September 27, 2016.

97.    SIM represented that the procedure was an open repair of an acute tear of A.S.'s rotator cuff with a claviculectomy.

98.    Suleiman, P.C. represented that the procedure was a repair of a chronic (rather than acute) rotator cuff tear, and also billed for a claviculectomy, synovectomy, extensive debridement, and subacromial decompression, the last three (3) of which were not billed at all by SIM.

99.    In addition to being mutually exclusive to the procedure represented by SIM by claiming A.S.'s condition was chronic, the bill from Suleiman, P.C. contained charges for services that were not performed at all.

100.   A charge for synovectomy is only proper when a procedure is done to address an underlying diagnosis of a pathologic synovium and not when an action is incidental to a separate procedure.

101.   A charge for extensive debridement is only proper when the procedure involves debriding several separate compartments or areas of the shoulder from that which is the subject of the primary procedure.  A separate billing code exists for limited debridement of a single area.

102.   Even if it were assumed, *arguendo*, that any debridement done by Suleiman was billable at all (which, again, was not billed by SIM), such debridement could not be considered "extensive."

103.   Both of these charges billed by Suleiman, P.C. were for specific services that were not actually performed during the alleged procedure to A.S.

104.   Defendant SIM billed for an alleged shoulder surgery to patient J.W. (Claim No. 0487022600) on August 10, 2018, that was represented to be primarily an open rotator cuff repair by both SIM and the surgeon.

105.   Unlike the surgeon, SIM also billed for the alleged performance of a capsulorrhaphy that was not done.

106.   SIM also submitted a separate charge for the alleged use of a prosthetic implant, which is not described by the operative report and which would be fraudulently unbundled even if such a device was used, which it was not.

107.   Defendant SIM billed for an alleged left knee surgery to patient T.R. (Claim No. 0396919748) on July 21, 2017 by one of its owners, Kevin Crawford, D.O. ("Crawford").

108.   Prior to this alleged knee surgery, T.R. underwent at least three (3) imaging studies of his left knee that were necessitated by an incidental finding of what appeared to be a neoplasm in his femur.

109.   The second imaging study of T.R.'s left knee, dated May 24, 2017, expressly stated that there was "no MR evidence for internal derangement of knee."

110.   The third imaging study of T.R.'s left knee, dated June 5, 2017 and performed with contrast to enhance the quality of the images, did not note any structural issues with T.R.'s knee.

111.   In light of the negative imaging studies, it is inexplicable why SIM billed for a surgery to T.R.'s left knee at all on July 21, 2017.

112.   Crawford billed just $3,100 for the alleged procedure, which he represented was a meniscectomy in a single compartment of the left knee, and expressly and repeatedly noted that his observations during the procedure were of "very mild" and "very minimal" issues with T.R.'s knee.

113.   SIM billed nearly eight (8) times the amount as Crawford ($23,264), in large part because it claimed the procedure also included a "major" synovectomy of two (2) or more compartments of T.R.'s knee.

114.   A billable synovectomy was not performed at all to T.R., and to the extent that any procedure incidental to the purported meniscectomy was performed, it was not major and was to a single area of T.R.'s knee.

115. SIM's bill claiming that a major synovectomy to multiple compartments was performed was false as no such procedure was performed at all.

116. SIM also falsely represented that the meniscetomy was to T.R.'s right knee.

## B.    BILLING FOR URINE DRUG TESTING NOT PERFORMED

117. The outrageous amounts of unnecessary urine drug testing ordered by the defendants and billed by Biomolecular Integrations pursuant to the defendants' predetermined protocol is detailed below.

118. However, Biomolecular Integrations also routinely billed Allstate for urine drug testing that was not performed at all.

119. As detailed below, the urine specimens that were allegedly mailed to Biomolecular Integrations for testing were accompanied by prescription forms designed to maximize the number of drugs and analytes ordered, even when such drugs and analytes had nothing to do with the patients' medications or potential abuse thereof.

120. Biomolecular Integrations then billed for such purported testing using HCPCS code G0483, which is the most extensive testing code available and which is only to be used when a urine specimen is tested for at least twenty-two (22) different drug classes.

121.  Despite claiming to perform testing for far more drugs and analytes than could ever be considered medically reasonable or necessary, Biomolecular Integrations did not come close to testing for twenty-two (22) different drug classes per specimen, as its predetermined testing protocol included tests for numerous substances of the same class, such as multiple types of opiates, benzodiazepines, and antidepressants.

122.  As just one example of this fraudulent practice that was repeated with respect to numerous patients at issue herein, Biomolecular Integrations billed Allstate $2,608.65 for allegedly testing a urine specimen provided by patient R.T. (Claim No. 0579291253) for twenty-two (22) different drug classes.

123.  The laboratory report from Biomolecular Integrations confirms that nothing approaching this level of testing was actually performed, as only twelve (12) different drug classes were tested.

124.  Because alleged testing was done pursuant to a prescription form designed to make all physicians order the same excessive testing, each time Biomolecular Integrations billed using HCPCS code G0483 it made the same false and fraudulent representation of performing nearly twice as much testing as was actually done, if any testing was performed at all.

23

**C.     OTHER EXAMPLES OF BILLING FOR SERVICES NOT RENDERED**

125.   The categories of billing for services not rendered addressed above were repeated with respect to numerous patients because they were part of standard protocols used by the defendants to overcharge Allstate for purported services.

126.   The defendants also regularly billed Allstate for services not rendered in ways that were unique to individual patients and purported treatments.

127.   Ramakrishnan, P.C. billed Allstate for injections not actually provided to patients by adding charges for alleged injections to more disc levels than were actually treated, if any injections were performed at all.

128.   For example, Ramakrishnan, P.C. billed Allstate for a purported two (2) level bilateral facet joint injection to patient L.D. (Claim No. 0430608190) on July 18, 2018.

129.   A facet joint is located in the space between the bones of the spinal column, such that a two (2) level facet joint injection involves three (3) vertebral levels.

130.   L.D. underwent at most a single level injection at the facet joint between vertebra L4 and L5.

131.   Despite this, Ramakrishnan P.C. billed Allstate for a second level of facet injection, which it also falsely claimed was a bilateral procedure.

132.   Defendant New Clear billed for four (4) purported MRIs of patient C.R. (Claim No. 0585415607) on December 6, 2019 and May 13, 2020, at a rate of $4,900 per MRI.

133.   New Clear claimed to image C.R.'s lumbar and cervical spine on December 6, 2019 and lumbar spine and left shoulder on May 13, 2020.

134.   When C.R. was asked about these purported MRIs, she testified that she was not familiar with the May 13, 2020 scans or any that were done on her spine:

Q:   Do you recall later in May of 2020 getting an MRI on your lumbar spine?

A:   No.

Q:   Would have been at New Clear Imaging on May 13, 2020, your lumbar spine and left shoulder, doesn't sound familiar?

A:   No.  They never did anything on my spine.

135.   Defendant SIM billed for an alleged cervical disc replacement surgery to patient D.G. (Claim No. 0567491501) on September 16, 2020 and claimed that the procedure was done by a physician named Andrew Appel, M.D. ("Appel").

136.   Appel testified that he has not seen a patient in person in Michigan since the start of the COVID-19 pandemic.

137.   Each of these are merely representative examples of the types of billing for services not rendered that are routinely submitted by the defendants.

## VI.   <u>UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES</u>

138.   The defendants violated several Michigan laws and regulations in their effort to bill Allstate as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatments and services.

139.   Defendant New Clear submitted to Allstate records, bills, and other medical documentation for services that were not compensable under Michigan's No-Fault Act because they were not lawfully rendered.

140.   Michigan law requires persons or entities seeking to initiate, expand, replace, or acquire a MRI service provider first obtain approval, called a Certificate of Need ("CON"), from the State of Michigan's Department of Health and Human Services ("DHHS").

141.   New Clear obtained approval from DHHS to acquire and operate a MRI service from Pearl Health Management, Inc. ("Pearl") located at 17000 Executive Plaza Drive, Suite 140, Dearborn, Michigan on October 6, 2020.

142.   Despite not being authorized to operate a MRI service until October 6, 2020, New Clear began billing Allstate for allegedly performing MRIs on or about August 26, 2019.

143.   Between August 26, 2019 and October 5, 2020, New Clear billed Allstate in excess of $460,000 with respect to 95 alleged MRI scans on 31 different

Allstate insureds that it was not permitted, authorized, or approved by the State of Michigan to perform.  *See* Exhibit 5.

144.   Allstate was not aware that New Clear was not authorized by the State of Michigan to operate a MRI facility at the time it received these bills from New Clear.

145.   Indeed, Pearl and New Clear filed documents with the Michigan DHHS that are calculated to mislead the agency and insurers about the relationship between the entities, including by falsely representing New Clear was merely a fictitious name of Pearl when in fact New Clear was its own legal entity that billed Allstate using its own tax identification number.

146.   Allstate reasonably relied on the bills and medical records received from New Clear and was thereby induced to make payments to New Clear for billing submitted to it by New Clear for MRIs allegedly performed prior to October 6, 2020.

147.   Because New Clear was not authorized or approved to operate a MRI facility, its operation of the MRI facility at 17000 Executive Plaza Drive, Suite 140, Dearborn, Michigan prior to October 6, 2020 was unlawful and not compensable under the No-Fault Act.

148.   Allstate is not required to pay New Clear for MRIs that it was not authorized to perform and is entitled to restitution for payments it was induced to make by New Clear's fraudulent bills.

## VII.   <u>MULTIPLE BILLING FOR IDENTICAL SERVICES</u>

149.   EASC, SIM, Suleiman P.C., and Ramakrishnan P.C. also each regularly billed Allstate multiple times for the same purported services.

150.   When a procedure is performed on an outpatient basis, any facility fee associated with such procedure must be billed using the CPT code(s) that describes the procedure and all drugs, supplies, and ancillary services provided by the facility are included in the charge.

151.   For the vast majority of the procedures at issue, EASC and SIM billed both CPT codes that are inclusive of all purported services and separate line items for supplies, drugs, and other materials allegedly used during such procedures.

152.   SIM billed Allstate at least $74,937 for implants, surgical tools, and other supplies allegedly used during procedures, all of which was also covered by the charges for the procedures themselves (which, of course, SIM did not provide any professional services for and only billed for its provision of space and supplies). *See* Exhibit 2.

153.   EASC billed Allstate at least $124,100 for implants, surgical tools, and other supplies allegedly used during procedures, all of which was also covered by the charges for the procedures themselves, none of which were separately payable from the facility charge for the procedures.  *See* Exhibit 1.

28

154.   In addition to improperly double billing Allstate for supplies, drugs, and ancillary services that were already included in the facility charge for procedures themselves, EASC and SIM regularly billed Allstate for components of procedures that are not separately billable.

155.   In these instances, EASC and SIM billed Allstate at least three (3) separate times for the exact same purported services.

156.   Among the charges that were routinely fraudulently unbundled by EASC and SIM in this manner were purported use of fluoroscopy during procedures, debridement and other components of surgical procedures that are included in the charge for primary procedures, and instrumentation that is included in the cost of alleged procedures.

157.   The bills for professional services submitted by Suleiman P.C. and Ramakrishnan P.C. for the procedures done at EASC and SIM used many of the same fraudulent billing practices to double-bill Allstate for purported services.

158.   For example, both EASC and Suleiman P.C. billed Allstate with respect to an alleged shoulder arthroscopy to patient T.M. (Claim No. 0568484778) on September 15, 2020, submitting charges for multiple separate procedures, including repair of a SLAP tear (CPT code 29807), synovectomy (CPT code 29821), claviculectomy (CPT code 29824), lysis (CPT code 29825), subacromial decompression (CPT code 29826), and an unlisted procedure (CPT code 29999),

which EASC and Suleiman claimed represented either a biceps tenodesis or a thermal capsular shift.

159.   Of these charges submitted by both EASC and Suleiman P.C., at least the synovectomy, lysis, and the unlisted procedure (regardless of whether it was a biceps tenodesis or thermal capsular shift) were fraudulently unbundled, if they were performed at all.

160.   Similar fraudulent double-billing was repeated by the defendants with respect to nearly every purported orthopedic surgery and pain management injection at issue herein.

161.   Among the most commonly billed procedures by defendants Ramakrishnan P.C. and EASC were outpatient spinal fusion surgeries that they collectively billed for a total of more than $166,000 per procedure, and in some instances, more than $210,000 per procedure.

162.   The defendants generated the enormous total for these outpatient procedures by double- and triple-billing Allstate for the majority of the components thereof.

163.   For example, EASC and Ramakrishnan P.C. billed Allstate for an alleged outpatient spinal surgery to patient Y.S. (Claim No. 0592545123) on November 5, 2020.

164.   EASC billed Allstate separately for each of the following purported components of the procedure: (1) arthrodesis, (2) instrumentation, (3) insertion of device, (4) use of operating microscope, (5) fluoroscopy, (6) a second charge for fluoroscopy using a CPT code that was deleted in 2019, and (7) a prosthetic implant.

165.   Of these seven (7) separate charges, five (5) (instrumentation, use of microscope, both fluoroscopy charges, and the prosthetic implant) were included components of the charges for arthrodesis and insertion of a biomechanical device.

166.   Similarly, Ramakrishnan P.C. billed Allstate separately for the following purported components of the procedure: (1) arthrodesis, (2) instrumentation, (3) insertion of device, (4) allograft, (5) use of operating microscope, and (6) fluoroscopy.

167.   Of these six (6) separate charges, four (4) (instrumentation, allograft, use of microscope, and fluoroscopy) were included components of the charges for arthrodesis and insertion of a biomechanical device.

168.   In other words, more than two-thirds of the charges for the alleged procedure to Y.S., which was billed consistently with numerous other patients at issue herein, were fraudulently double- and triple-billed.

169.   In addition to unbundling fluoroscopy charges from routine pain management injections that should never have been done in a surgical setting in the

first place, defendant EASC further fraudulently inflated its charges by billing Allstate separately when an injection was allegedly done bilaterally.

170.   When a procedure is done bilaterally, CPT code modifier 50 may be reported by a provider as a signal to the payor that results in an increase in the payment rate.

171.   Rather than adhere to billing guidelines for the CPT codes it used to submit charges to Allstate, EASC submitted separate charges, in the same unreasonable amount that often exceeded $8,000 per vertebral level, when pain management injections were allegedly done bilaterally.

172.   In some instances, EASC billed both using the bilateral CPT code modifier and separately for the individual sides of the purported injections.

173.   For example, on June 24, 2021, EASC billed an outrageous $34,558.77 for a purported routine two-level facet injection and epidural steroid injection by Ramakrishnan.

174.   For both levels of the alleged facet injection, EASC billed twice, once using CPT code modifier 50 signaling a bilateral procedure and once using CPT code modifier "RT" signaling a right-sided procedure.

175.   For both charges, EASC sought to induce Allstate to pay it twice (at ridiculously inflated amounts) for the same unnecessary services.

## VIII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

176.  The defendants' willingness to bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

177.  The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

178.  The defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

179.  The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed were not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

180.  The unnecessary treatment billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 6.

181.   All of the claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

182.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

183.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

A.   THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

184.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing.

185.   The defendants' treatment protocol was characterized by an initial evaluation of patients at one of the defendant clinics at which time the defendant clinics (1) claimed that the patient reported pain in multiple areas of the back and joints, (2) made generalized, vague diagnoses of strains and sprains, (3) ordered diagnostic testing (prior to attempting conservative care or evaluating improvement with the passage of time), typically consisting of multiple, repeated x-rays and/or

ultrasounds billed by the defendant clinics and MRIs billed by defendant New Clear, (4) prescribed numerous medications, (5) ordered extensive panels of definitive drug testing billed by defendant Biomolecular Integrations whether or not patients were prescribed medications susceptible to abuse or misuse, and (6) ordered extensive physical therapy that then was billed by the defendant clinics or by associated providers.

186.   As part of the defendants' predetermined treatment protocol, patients also were automatically scheduled to undergo frequent reevaluations at the defendant clinics, whether or not there was any medical need for such reevaluations, which the defendants used to order repeated x-rays and urine drug testing, prescribe frequent and unnecessary refills of medications, and order continued physical therapy without medical basis.

187.   The defendants also utilized the patient reevaluations to recommend various injections and surgical procedures that were not warranted by the clinical examinations, were made prior to allowing conservative treatment such as physical therapy time to be effective, and that were made whether or not conservative treatments had proven beneficial or the patients' condition was improving.

188.   After pressuring patients to undergo injections or surgeries, the defendants scheduled these procedures to occur at defendants EASC or SIM regardless of whether the utilization of a surgical suite was medically necessary in

order to increase the total amount the defendants were able to bill to Allstate for each such procedure.

189.   As one example of the defendants' implementation of their predetermined treatment protocol, patient A.S. (Claim No. 0541603536) presented to Suleiman P.C. for an initial evaluation on August 12, 2019.

190.   Suleiman P.C. noted complaints of right shoulder pain, cervical spine pain, and lumbar spine pain, diagnosed A.S. with a strain of a muscle/tendon in the right shoulder rotator cuff and cervical and lumbar disc displacements, and ordered MRIs of the cervical, thoracic, and lumbar spine, as well as physical therapy for the shoulder (3) three times a week for six (6) weeks and for the cervical and lumbar spine three (3) times a week for eight (8) weeks.

191.   At a reevaluation of A.S. just over one (1) month later, Suleiman P.C. noted that A.S.'s pain in the right shoulder was relieved by physical therapy, but nevertheless recommended that A.S. undergo a shoulder arthroscopy/rotator cuff repair "because the patient did not improve with conservative treatment and continued having progressive pain."

192.   Over a period of less than three (3) months following a purported shoulder surgery on October 22, 2019, Suleiman P.C. billed for allegedly obtaining x-rays during reevaluations of A.S. on four (4) occasions despite noting no significant change in the patient's condition.

193.   Between November 6, 2019 and September 21, 2020, Suleiman P.C. claimed to evaluate A.S. nine (9) different times, during which time it continued to note vague complaints of shoulder and back pain, continued to prescribe various pain medications, and continued to prescribe physical therapy.

194.   Suleiman P.C. also continued to pressure A.S. to undergo additional medical procedures throughout this period.

195.   For example, on July 13, 2020, Suleiman P.C. recommended A.S. undergo a manipulation under anesthesia procedure on his shoulder because "patient did not improve conservatively" at the same time as A.S. continued to report that his shoulder pain was relieved by physical therapy and his condition was improving.

## B.   EXCESSIVE AND UNNECESSARY INJECTIONS

196.   The category of procedure most commonly abused by the defendants was purported pain management injections, which were not indicated to be performed at all and were never appropriate to perform in ambulatory surgery centers (like defendants EASC and SIM) rather than in physician's offices.

### 1.   Billing for Injections Not Medically Indicated

197.   The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

198.   As discussed above, examinations billed by the defendants, if they were performed at all, resulted only in boilerplate findings and predetermined treatment plans that were not adequate to support the performance of invasive procedures.

199.   Moreover, the defendants routinely conflated the injection procedures that are intended to be used for diagnostic purposes with procedures that are intended for therapeutic purposes.

200.   The defendants ignored diagnostic information gleaned from previous injections, and instead persisted in recommending that patients undergo additional rounds of injections to generate bills to Allstate.

201.   Consequently, patients were subjected to unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

202.   The defendants billed for alleged injections to patients at issue in this Complaint without regard for conservative forms of treatment.

203.   Even in those instances where patients reported improvement from conservative treatment, the defendants nonetheless pushed for injections to be administered.

204.   EASC, SIM, Suleiman P.C., and Ramakrishnan P.C. frequently ordered and billed for repeat injections without analyzing the efficacy of prior procedures, in derogation of standards of care.

205.   Indeed, EASC, SIM, Suleiman P.C., and Ramakrishnan P.C. routinely scheduled patients and billed for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

206.   As one example of this practice, the defendants frequently billed for performing both spinal epidural steroid injections at multiple vertebral levels as well as facet block injections at the same vertebral levels on the same patient on the same dates of service.

207.   Facet block injections are indicated when a patient complains primarily of axial, non-radiating spinal pain and involve injecting anesthetic near medial branch nerves that feed out from facet joints and are intended to be diagnostic, in that if a patient experiences a sufficient level of short term pain relief for an appropriate period of time then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for other therapeutic treatments such as radiofrequency ablation or rhizotomy.

208.   Epidural steroid injections ("ESI") are indicated when a patient complains of radicular pain (which must be confirmed through a proper neurologic evaluation and testing) and are both diagnostic and therapeutic, in that if a patient experiences a sufficient level of pain relief for an appropriate period, the injected

disc space is determined to be the possible source of the patient's pain and further treatment, including ESIs, may be appropriate.

209.   It is medically improper and pointless to perform ESIs at the same time as facet block injections because it is then not possible to determine which injection was beneficial or to identify the actual source of the patient's claimed pain.

210.   As one example of the defendants' practice of billing for both spinal ESI and bilateral facet block injections at the same vertebral levels on the same dates of service for the same patient, EASC billed for multiple facet and lumbar ESI injections allegedly done by defendant Suleiman to patient M.K. (Claim No. 0460203367) on June 25, 2019 and did so again on September 10, 2019.

211.   On each occasion, EASC billed for epidural injections at three (3) spinal levels and bilateral facet block injections at the same three (3) spinal levels.

212.   Similarly, on September 11, 2019, Ramakrishnan P.C. and EASC billed for both a lumbar ESI at L5-S1 and bilateral facet injections at L3-L4, L4-L5, and L5-S1 to patient D.Y. (Claim No. 0526210471).

213.   D.Y. was allegedly reevaluated by Ramakrishnan on October 10, 2019, approximately one month after the injections, and reported continued pain and that the injections helped for only approximately two (2) weeks.

214.   Despite the report of only a limited, temporary benefit from the previous injections, and despite making no purported findings of which injections

provided the temporary benefit, Ramakrishnan's treatment plan from the October 10 visit included repeating the lumbar ESI.

215.   Even though the October 10 treatment plan for D.Y. called for only a repeated lumbar ESI, on November 13, 2019, Ramakrishnan P.C. and EASC each billed Allstate for a lumbar ESI at vertebral level L5-S1 as well as for the same bilateral facet injections at lumbar levels L3-L4 and L4-L5 that were billed on September 11, 2019.

216.   In addition to being improper to bill in conjunction with ESI, there is no medical reason to repeat facet injections, which are a diagnostic procedure to evaluate whether to proceed to other types of treatment.

217.   In the example above, the defendants' practice of improperly billing for multiple types of injections at the same time confounded and rendered the diagnostic purpose of the injections useless.

218.   The defendants also improperly billed for repeated facet injections even when done alone.

219.   For example, defendant SIM billed for facet injections to patient S.P. (Claim No. 0418749909) three (3) times over the course of less than one (1) month, on October 3, 2019, October 17, 2019, and October 30, 2019.

220.   There could not have been a medically appropriate reason for these injections to be repeated several times, particularly over such a short period, and the

bills submitted to Allstate for doing so were designed only to maximize the charges relative to S.P.

221.   Moreover, and as detailed below, there was never a reason for any of the facet injections to S.P. to have been done in a surgical center setting, and doing so created unnecessary medical risk to the patient for the sole purpose of enriching the defendants.

222.   The defendants also billed for ESI that had no conceivable medical or diagnostic purpose.

223.   For example, Ramakrishnan P.C. and SIM billed Allstate for an alleged ESI to patient S.D. (Claim No. 043060190) on January 25, 2018.

224.   An ESI is a diagnostic tool that can only be properly evaluated when a patient provides the physician with a detailed account of the changes to their pain intensity and quality in the days and weeks after administration.

225.   The alleged injection to S.D. never had any intent of being used for this purpose, as Ramakrishnan P.C. billed for a comprehensive spinal surgery to S.D. the very next day, January 26, 2018.   The surgery itself, in addition to the strong analgesics administered in connection therewith, removed any possible diagnostic value from the ESI for which Allstate was billed.

## 2.    Medically Unnecessary Use of Ambulatory Surgery Centers

226.   In addition to billing for injections that were not medically appropriate for the reasons discussed above, the defendants multiplied the amounts charged to Allstate and increased the danger of complications to their patients by performing routine pain management injections under anesthesia in the operating rooms of defendants EASC and SIM.

227.   Both ESIs and facet injections, which were the most common pain management injections billed by the defendants, are simple injections of steroid solution that are performed in just minutes and can and should be performed in a doctor's office with a local anesthetic absent unique circumstances that are documented in a patient's medical record.

228.   By utilizing EASC and SIM for injections and other procedures that did not require the use of such facilities, the defendants were able to submit bills to Allstate for both physician services and for a facility fee, thereby more than doubling the total charge amount for the same routine procedures than if the procedures were performed in Suleiman P.C.'s or Ramakrishnan P.C.'s offices.

229.   The improper and unnecessary use of a surgical suite to generate bills to Allstate is illustrated by patient S.J. (Claim No. 0570134619), for whom EASC billed for a lumbar epidural steroid injection and lumbar facet injections at EASC on January 7, 2021, bilateral cervical facet injections at EASC on February 18, 2021,

and an additional round of lumbar facet injections at EASC on March 18, 2021 (which the operative report claims were actually cervical facet injection and which were referred to by Ramakrishnan in later records as an epidural steroid injection), all of which were allegedly administered by defendant Ramakrishnan and also billed by defendant Ramakrishnan P.C.

230.   Neither the operative reports for these injections nor the evaluation reports prepared by Ramakrishnan P.C. prior thereto identify any reason for the use of a surgical suite, and these injections, to the extent they occurred at all, were performed at EASC solely for the purpose of generating additional billing.

231.   As an additional example, Suleiman P.C. billed for a lumbar epidural steroid injection and bilateral lumbar facet blocks to patient H.H. (Claim No. 0483608493) at EASC on September 24, 2019.

232.   Neither Suleiman P.C.'s reports prior to the injections nor the EASC operative report identify any complicating factor requiring the use of a surgical suite for those injections, meaning there was no reason those injections could not have been done in Suleiman P.C.'s offices.

233.   The injections administered to H.H. were performed in the EASC surgical suite, if they occurred at all, in order to generate additional billing to Allstate.

234.   EASC billed Allstate $39,377 in facility fees for the injections to H.H. and Suleiman P.C. billed Allstate an additional $10,825 for professional services for the same routine injections.

235.   As another example, SIM billed for alleged lumbar injections to patient G.G. (Claim No. 0509450045) on September 20, 2018, October 4, 2018, and October 25, 2018.

236.   Neither the records from the procedures themselves or from the reports for the evaluations prior to the injections, which were ordered by All Care Medical Services and allegedly performed by Jeff Pierce, D.O., address why the injections were performed at SIM or why the use of a surgical suite was necessary to perform these routine injections.

237.   The fact that it was unnecessary to perform routine pain management injections in surgical settings is further confirmed by the fact that the defendants performed more complex procedures, including when patients were under anesthesia, in their offices.

238.   For example, Ramakrishnan P.C. billed for a kyphoplasty, which is a type of spinal surgery, to patient R.B. (Claim No. 0486382996) in its office on February 28, 2018.

239.   Ramakrishnan's ability to perform this surgery in his office and without the use of surgical facilities confirms that routine pain management injections could

also easily have been performed in his office but for the defendants' goal of maximizing the amount charged to Allstate.

240.   In order to create the false appearance of medical necessity for the use of surgical facilities for routine pain management injections, the defendants also arranged for their associates to bill for anesthesia, which further increased the total amounts billed to Allstate.

241.   Subjecting patients to anesthesia for routine injections, without any medical basis, resulted in patients taking unnecessary risks of infection, airway obstruction, and other risks associated with anesthesia, all in order to permit the defendants to increase their bills to Allstate.

242.   Indeed, according to the American Society of Anesthesiologists ("ASA"),[3] "the majority of minor pain procedures … do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections."

---

[3] The ASA is an educational, research, and scientific association of physicians organized to raise the standards of the medical practice of anesthesiology and to improve patient care.

243.   The ASA further states that "[t]he use of general anesthesia for routine pain procedures is warranted only in unusual circumstances," which rarely present themselves.

244.   The ASA has expressly warned that unnecessary use of anesthesia for routine injections is a risky practice that is a major factor in the occurrence of inadvertent neural injury.   Rendering patients unconscious during an ESI is especially risky because the patient cannot communicate nerve pain to the injecting physician if the needle is placed in a location that might cause neural injury.

245.   All of the charges submitted to Allstate by the defendants for injections and other procedures that were not medically required to be performed in a surgical site setting are not compensable.

### C.   EXCESSIVE AND UNNECESSARY IMAGING

246.   The defendants subjected patients to excessive and unnecessary MRIs and x-ray imaging in order to generate additional billing to Allstate.

### 1.   Medically Unnecessary and Improper MRIs

247.   The defendants' predetermined treatment protocol included excessive orders for MRIs because such orders allowed their associates, including defendant New Clear, to submit hundreds of thousands of dollars of additional charges to Allstate for imaging billed at absurd rates.

248.   The purported MRIs billed by New Clear were to generate charges for the defendants' scheme and were not used to guide patient care.

249.   As set forth below, the defendants' practice of ordering MRIs as a matter of course based on fabricated diagnoses and alleged subjective pain complaints violates standards of care for MRI testing and the bills submitted to Allstate as a result of such practice are fraudulent.

### a.   MRI Testing Ordered and Billed Contrary to Standard of Care

250.   The defendants had a responsibility to ensure that MRIs were properly ordered and medically necessary, but they intentionally chose not to do so in order to maximize the amount of charges submitted to Allstate.

251.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

252.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

253.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and

response to provocative maneuvers, should be performed and documented in the medical record.

254.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

255.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

256.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

257.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

258.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

259.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

260.   MRIs should not be ordered in violation of the ACR guidelines unless there is a clinical reason in the specific case and that reason must be documented in the patient's medical record.

261.   One example of the defendants' failure to follow ACR guidelines involved patient F.A. (Claim No. 0593687528), who reported for an initial examination by Suleiman at Suleiman P.C. on August 12, 2020 and reported thoracic and lumbar spine pain, and right hand pain.

262.   Despite obtaining x-rays of the spine and hand that showed no abnormalities and a diagnosis of only "pain," Suleiman immediately ordered MRIs of the hand, thoracic spine, and lumbar spine, which were billed by defendant New Clear the next day, on August 13, 2020.

263.   Unsurprisingly, none of the MRIs billed by New Clear identified any significant abnormality, and a report from the next purported exam of F.A. on August 26, 2020 makes no mention of the results of the MRIs at all.

264.   The defendants routinely ordered MRIs based only on patients' alleged subjective pain complaints, when x-rays showed no abnormality, when conservative

treatment was effective, and without documenting any clinical reason for the MRIs ordered as required by the ACR guidelines.

265.   Vague, minor, and non-specific pain complaints such as those routinely reported by the defendant clinics are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to MRIs.

266.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

267.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinic problem or question) to obtain the missing information.

268.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

269.   MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiologic tests.

270.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

271.   Michigan regulations governing the licensing and operation of MRI facilities such as New Clear also required New Clear to verify that the MRIs it billed were medically necessary and appropriate, and specifically required New Clear to retain a physician "who shall be responsible for screening of patients to assure appropriate utilization of the MRI service." *See* Michigan Department of Health and Human Services Certificate of Need (CON) Review Standards for Magnetic Resonance Imaging (MRI) Services, § 14(2)(c)(i).

272.   Nevertheless, the MRIs at issue in this Complaint routinely lacked any documentation of why the MRI was ordered or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

273.   Despite its obligation to do so, New Clear never reviewed MRI orders from the other defendants or from other providers to determine whether the MRIs it was performing were medically necessary and appropriate, and never questioned whether the MRIs that were ordered were medically necessary.

274.   For example, Suleiman ordered four (4) MRIs of patient W.L. (Claim No. 0604967521), of the head, cervical spine, thoracic spine, and lumbar spine, on

November 3, 2020, just one (1) week after W.L. was allegedly involved in an automobile accident on October 26, 2020.

275.   On November 11, 2020, W.L. reported to New Clear for the MRIs ordered by Suleiman where he completed an "MRI patient history" form in which he reported his only complaints were "numbness in my arm and fingers."

276.   Despite the discrepancy in W.L.'s reported pain and the MRIs ordered by Suleiman for entirely different areas of the body, New Clear did not question the medical necessity of any of the MRIs and proceeded to bill for each of the ordered MRIs on that date.

277.   In other words, rather than fulfill the duties required by the ACR and Michigan law, New Clear billed for clearly excessive and medically unnecessary MRIs in order to increase the amount of payment sought from Allstate.

### b.   MRIs Billed During Initial Stages of Treatment

278.   MRIs at issue herein were routinely ordered by Suleiman P.C. and other medical providers at the outset of the patient's treatment, and before allowing time for conservative treatment to be effective (or in many cases, even begin), thus evidencing that MRIs were ordered as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

279.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have

shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 945 (2012).

280.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id.

281.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

282.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

283.   New Clear routinely billed for MRIs of patients who had only just initiated treatment, often within the first thirty (30) days after patients' alleged accidents.

284.   New Clear was fully aware that these MRIs it billed for were ordered within days of patients' purported accidents, since it required patients to complete a

patient history like the following sample that specifically asked whether the MRI was the result of an auto accident and the date of the accident:



**NEW CLEAR IMAGES**
17000 EXECUTIVE PLAZA DRIVE
DEARBORN, MI 48126
PHONE: (248)946-2646 FAX: (586)261-5130
Newclearmri@gmail.com

**MRI PATIENT HISTORY**

IS THIS SCAN BEING DONE DUE TO AN INJURY OR AN ACCIDENT? YES OR NO

IF YES; DATE OF INJURY OR AUTO ACCIDENT ___10-26-20___

IF THIS IS PERTAINING TO AN AUTO ACCIDENT WERE YOU;

(CIRCLE ONE) PEDESTRIAN PASSENGER DRIVER

285. Additional examples of New Clear billing for MRIs just days after patients' alleged accidents include the following:

a. New Clear billed for three (3) MRIs of patient B.P. (Claim No. 0562634485) on October 4, 2019, just seven (7) days after his purported accident.

b. New Clear billed for two (2) MRIs of patient J.H. (Claim No. 0620746412) on February 19, 2020, just thirteen (13) days after his purported accident.

c. New Clear billed for four (4) MRIs of patient W.L. (Claim No. 0604967521) on November 11, 2020, just sixteen (16) days after his purported accident.

d. New Clear billed for four (4) MRIs of patient B.J. (Claim No. 0626168207) on June 8, 2021, just twenty-four (24) days after his purported accident.

286. It is not possible for patients for whom MRIs were performed just days or weeks after their alleged motor vehicle accidents to have attempted the conservative treatment required by the ACR guidelines before resorting to MRIs.

287. The patients at issue herein for whom New Clear billed for MRIs within the first days and weeks after their alleged motor vehicle accidents had non-emergent medical conditions that were often "diagnosed" as nothing more than pain, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging. Thus, these MRIs were unnecessary and not compensable under the No-Fault Act.

### c. Excessive MRI Scans

288. In addition to billing for MRIs as soon as possible after an alleged accident in violation of the standard of care, the defendants also sought to maximize the amount of charges submitted to Allstate by ordering and billing for far more MRIs than were medically necessary.

289. MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

290. The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,117) of all patients underwent MRIs of multiple body parts during the same visit, and only 3.4% (31,044

of 905,117) of all patients underwent MRIs of three (3) or more body parts during the same visit.

291.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

292.   By comparison, New Clear has billed Allstate for two (2) or more MRIs on the same date for more than 63% of all MRI visits.  *See* Exhibit 5.

293.   New Clear has billed for three (3) or more MRIs during a visit for 42.1% of all MRI visits it billed to Allstate.  Id.

294.   The extreme number of MRIs per patient billed by New Clear is illustrated on the chart below:



295.   Representative examples of New Clear's billing for excessive numbers of MRIs include:

a. Patient S.R. (Claim No. 0617178918).  New Clear billed Allstate for five (5) MRIs on August 26, 2020, just six (6) days after she was allegedly involved in an accident.

b. Patient W.P. (Claim No. 0615107612).  New Clear billed Allstate for four (4) MRIs on October 23, 2020, just one (1) month after he was allegedly involved in an accident.

c. Patient O.C. (Claim No. 0599282910).  New Clear billed Allstate for four (4) MRIs on August 7, 2020, just thirteen (13) days after his alleged accident.

d. Patient C.H. (Claim No. 0621628205).  New Clear billed Allstate for three (3) MRIs just over one (1) month after C.H. was allegedly involved in an accident, and then billed Allstate again for the same three (3) MRIs less than two (2) months later.

296.  Allstate is entitled to the return of money paid for New Clear's medically unnecessary imaging ordered and billed pursuant to the defendants' predetermined treatment protocol.

## 2.    **Medically Unnecessary and Improper X-rays**

297.  The defendants' practice of ordering frequent and repeated x-rays was contrary to medical practice guidelines and was not based on medical necessity.

298.  The Food and Drug Administration's ("FDA") guidelines for x-ray imaging advise that providers minimize radiation exposure to patients from x-rays by ordering "examinations using ionizing radiation . . .  only when necessary to answer a medical question, treat a disease, or guide a procedure."

299.  According to FDA guidelines, "the clinical indication and patient medical history should be carefully considered before referring a patient for any X-ray examination."

300.  FDA guidelines also warn against unnecessarily repeating x-ray imaging, advising that "even when an exam is medically justified, without sufficient information about a patient's medical imaging history, a referring physician might unnecessarily prescribe a repeat of an imaging procedure that has already been conducted."

301.  Contrary to these guidelines, Suleiman and Ramakrishnan routinely ordered, and Suleiman P.C. and Ramakrishnan P.C. routinely billed for, the same x-rays on patients at multiple, and often at nearly every, patient evaluation.

302.  As one example of this practice, Ramakrishnan purportedly evaluated patient G.G. (Claim No. 0407269562) over a period of approximately fifteen (15) months from June 2016 through September 2017.

303.  During that time, Ramakrishnan P.C. billed Allstate for seven (7) x-rays on six (6) different dates, including for the same set of lumbar x-rays on five (5) occasions, even though Ramakrishnan also ordered MRIs of the same areas on two (2) occasions during the same time.

304. Ramakrishnan P.C.'s examination reports never explained why new x-rays were medically necessary, and never identified any factors to warrant repeating the same x-rays that had previously been performed.

305. As another example, Ramakrishnan P.C. billed Allstate for cervical x-rays with respect to patient M.Z. (Claim No. 0562967026) on five (5) dates of service over a period of just seven (7) months, but never documented why the repeated x-rays were medically necessary.

306. Suleiman P.C. utilized the same practice, ordering frequent and repeated x-rays without identifying any medical necessity for such testing.

307. For example, Suleiman P.C. billed Allstate for the same shoulder x-rays of patient A.S. (Claim No. 0541603536) on five (5) dates of service over a period of just five (5) months but never explained why the repeated x-rays were being ordered or were medically necessary.

308. Similarly, Suleiman P.C. billed Allstate for shoulder x-rays of patient A.M. (Claim No. 0397545781) on nine (9) occasions over a period of just fifteen (15) months and billed Allstate for shoulder x-rays of patient R.M. (Claim No. 0557710506) on six (6) separate dates in just six (6) months.

309. Each of the x-rays to A.M. resulted in just a single line in Suleiman P.C.'s evaluation notes that the patient did not have a fracture or bony abnormality, but that was never even a concern relative to A.M., for whom Suleiman P.C. (and

SIM) had billed for an arthroscopy to address soft tissue, not bone, injury, and who had not reported any intervening injury.

310.    There was no medical justification for repeatedly ordering the same x-rays for these patients over such a short period of time and, like with subjecting patients to unnecessary anesthesia for routine pain management injections, placed patients in danger solely to generate additional bills to Allstate.

###    D.    EXCESSIVE AND UNNECESSARY PHYSICAL THERAPY

311.    As part of their predetermined treatment protocol, the defendants utilized Suleiman P.C. and Ramakrishnan P.C. to automatically prescribe physical therapy for nearly every patient at nearly every appointment.

312.    The physical therapy prescribed by the defendants was not designed or intended to treat any actual injury, but was primarily used as a means to generate additional billing.

313.    The automatic prescription of physical therapy for nearly every patient was designed to, and did in fact, financially benefit the defendants, since Suleiman P.C. directly billed for much of the purported physical therapy prescribed.

314.    Valid orders for physical therapy treatment require the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

315.    Physical therapy that is ordered for every patient automatically, instead of based on objective indications specific to the particular patient, is not medically necessary.

316.    In addition to ordering physical therapy for almost every patient, the defendants ordered excessive amounts of physical therapy and continued to do so even when the patients received no benefit from the physical therapy.

317.    Patients rarely should receive physical therapy for more than four (4) to six (6) weeks, as after such time the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

318.    When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

319.    Contrary to these guidelines, the defendants routinely ordered, and Suleiman P.C. billed Allstate for, physical therapy that often continued for more than six (6) months, and often for years, without ever substantially altering patients' treatment.

320.    For example, Suleiman P.C. billed Allstate for physical therapy allegedly rendered to patient A.S. (Claim No. 0394083943) on at least 145 dates of service over a period of more than 16 months between November 3, 2016 and April

25, 2018, billing for nearly identical physical therapy services on the vast majority of those dates.

321.   Suleiman P.C. billed Allstate for physical therapy services with respect to patient A.A. (Claim No. 0538630435) on at least 115 dates of service over a period of nearly two (2) years between March 25, 2019 and February 24, 2021.

322.   During the nearly two (2) years that A.A. purportedly received physical therapy at Suleiman P.C., allegedly to treat both cervical and low back pain, Suleiman P.C. never substantially altered his treatment plan or the long term goals of the physical therapy, as proven by the fact that "progress notes" from a physical therapy session in April 2019 and from a session almost nine months later refer to virtually identical treatment plans and identify identical long term goals that were "to be achieved within six weeks."

323.   That the ongoing physical therapy ordered by Suleiman P.C. and Ramakrishnan P.C. was designed to financially benefit the defendants and was not designed or intended to treat any actual injury also is demonstrated by the fact that physicians at Suleiman P.C. and Ramakrishnan P.C. did not evaluate the efficacy of the physical therapy beyond formulaic statements in their reports, typically claiming that the physical therapy was moderately helpful or that pain was relieved by physical therapy, and they did not alter physical therapy treatment or goals.

324.   For example, following a purported automobile accident on January 6, 2016, patient A.M. (Claim No. 0397545781) allegedly underwent a right shoulder arthroscopy procedure performed by Suleiman at SIM on April 19, 2016, and a left shoulder arthroscopy procedure performed by Suleiman at EASC on April 18, 2017.

325.   Suleiman P.C. repeatedly prescribed A.M. bilateral shoulder physical therapy "3 times per week for a total of 6 weeks" beginning in March 2016 and continuing through both alleged surgeries until at least May 2018, and never evaluated the effectiveness of the physical therapy beyond including the stock language in certain of the reports prepared for more than 20 reevaluations of A.M. by Suleiman P.C. during that time that "[p]ain is relieved by physical therapy."

326.   Suleiman P.C. also billed for administering physical therapy to A.M. during part of the more than 27 months that it prescribed bilateral shoulder physical therapy, during which time it never significantly altered A.M.'s treatment plan or the short or long term goals of the physical therapy.

327.   For example, physical therapy evaluation reports prepared by Suleiman P.C. for June 1, 2017, July 6, 2017, August 9, 2017, and October 11, 2017 all include identical short term ("2 weeks") goals and identical long term ("4 weeks") goals.

328.   On the rare occasions when Suleiman P.C. and Ramakrishnan P.C. reports did mention that physical therapy was not helping, such language was used only to justify orders for injections and other invasive treatment, not to evaluate

whether the physical therapy should continue, which is demonstrated by, *inter alia*, the fact that even when the defendants billed for such injections and other procedures allegedly on the grounds that conservative care was unsuccessful, they also continued to order the same physical therapy.

329.   For example, Suleiman P.C.'s reevaluation report for patient A.S. (Claim No. 0541603536) on July 13, 2020 first states that A.S.'s shoulder pain was relieved by physical therapy and that his condition was improving and prescribed continued physical therapy, but also states that this conservative treatment did not result in improvement of A.S.'s condition, which it used as a basis to recommend A.S. undergo a manipulation under anesthesia.

330.   Allstate is not required to pay Suleiman P.C. for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

### E.   UNNECESSARY DRUG TESTING

331.   The defendants routinely ordered, and defendant Biomolecular Integrations routinely billed for, definitive urine drug that was not medically necessary and that was ordered contrary to standards of care.

332. The defendants ordered definitive drug testing even when there was no clinical indication for ordering drug testing at all, and did not use the results of the definitive drug testing to guide patient treatment.

333. Defendant Biomolecular Integrations routinely billed for dozens of definitive urine drug tests on patients even though the orders for such testing demonstrated no medical basis for the order, and even though the tests billed were not specifically ordered and were irrelevant to patient treatment.

334. The definitive urine drug testing ordered by the defendants was done to permit defendant Biomolecular Integrations to submit thousands of dollars of bills to Allstate for alleged testing performed on each specimen purportedly collected, not for reasons of medical necessity.

## 1. Orders for Medically Unnecessary Definitive Urine Drug Testing

335. Urine drug testing is only properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications prescribed as part of a pain management treatment plan.

336. Guidelines published by the Centers for Medicare and Medicaid Services ("CMS") for the proper use of urine drug screening performed in the context of a physician prescribing opioid medications to treat patients for chronic pain advise that testing may be appropriate to monitor for issues such as substance

abuse disorder, medication adherence, diversion, efficacy, and side effects, and provide that in order to establish the medical necessity for such testing, specific elements must be established during a clinical assessment and documented in the patient's medical record including (1) patient history, physical examination, and previous laboratory findings, (2) the patient's current treatment plan, (3) a review of the prescribed medications, and (4) a risk assessment plan.

337.   According to CMS guidelines, a risk assessment plan must evaluate the patient's risk potential for abuse and diversion, and document that assessment, and categorize the patient as low risk, moderate risk, or high risk.

338.   The frequency of random testing for a given patient should depend on the provider's completed risk assessment of the patient.

339.   CMS guidelines provide that random testing of low risk patients one (1) to two (2) times every twelve (12) months is appropriate, random testing of moderate risk patients one (1) to two (2) times every six (6) months is appropriate, and random testing of high risk patients one (1) to three (3) times every three (3) months is appropriate.

340.   The Centers for Disease Control and Prevention ("CDC") guidelines on opioids for chronic pain recommend that "[w]hen prescribing opioids for chronic pain, clinicians should use urine drug testing before starting opioid therapy and

consider urine drug testing at least annually to assess for prescribed medications as well as other controlled prescription drugs and illicit drugs."

341.   Contrary to these guidelines, the defendants frequently ordered definitive urine drug testing for patients for whom they prescribed medications despite not performing a risk assessment.

342.   Biomolecular Integrations also routinely billed for urine drug testing of drugs and analytes that could not have had any medical necessity, or indeed any use at all, in the medical management of the patients at issue.

343.   As just one example, among the dozens of drugs and analytes that comprised Biomolecular Integrations's predetermined panel of tests was cotinine, which is the analyte that detects whether a patient has used nicotine, an extremely commonly used substance that would not alter any medication management plan.

344.   On the other end of the spectrum, Biomolecular Integrations's predetermined panel of tests also included PCP, a rare street drug whose abuse would almost certainly be obvious to any medical practitioner without the need for thousands of dollars of definitive testing.

345.   Biomolecular Integration's billing for urine drug testing that could not possibly be medically necessary is exemplified by its bills relative to patient S.B. (Claim No. 0548894633), who was prescribed nothing but gummy vitamins and cyclobenzaprine (a mild, generic muscle relaxant).

346.   Biomolecular Integrations billed for allegedly testing three (3) urine specimens from S.B., on July 25, 2019, September 4, 2019, and September 26, 2019, all of which purported to include testing for scores of substances that had absolutely no bearing on the medications actually prescribed to S.B.

347.   Remarkably, on September 4, 2019 and September 26, 2019, Biomolecular Integrations did not even test for the presence of cyclobenzaprine, which was the only prescription written for S.B.

348.   Biomolecular Integrations also billed for testing for the presence of drugs that patients could not have been taking due to unrelated medical conditions.

349.   For example, patient M.D. (Claim No. 0584147177) had a "severe" allergy to morphine, but Biomolecular Integrations billed for testing M.D.'s urine specimens for morphine on at least five (5) separate occasions.

350.   A urine drug test was not necessary to find out if M.D. was taking morphine; it would be obvious when his body broke out in hives and he needed emergency medical treatment.

351.   Similarly, patient T.L. (Claim No. 0561791872) was repeatedly noted to be allergic to oxycodone, morphine, narcotics, and other substances, but Biomolecular Integrations nevertheless billed for testing for the presence of such substances on at least three (3) separate occasions over the course of just two (2) months.

352.   T.L. was also on chronic warfarin therapy due to a history of pulmonary embolism, which requires its own routine testing to ensure her blood clots at the appropriate rate.

353.   Warfarin is highly sensitive to drug interactions and any abuse or misuse of medications by T.L. would have been detected during her regular testing to manage her underlying medical condition; additional urine testing for substances she could not possibly take without causing herself severe injury or death was unnecessary and done only to generate charges to Allstate.

354.   Even in cases where drug testing may have been appropriate if properly documented, the defendants never used the urine drug testing they ordered to monitor for abuse or diversion by patients.

355.   Indeed, the medical purpose of urine drug testing ordered by the defendants was never clear, as examination reports frequently did not note that such testing was being ordered, did not note the results of such testing after it occurred, and did not use the results of testing to guide patient treatment.

356.   That the urine drug testing billed by Biomolecular Integrations was never intended to actually guide patient care is evidenced by the fact that it often took the defendants weeks to transmit the urine specimens to Biomolecular Integrations and even longer for the tests to be performed.

357.   It was not out of the ordinary for more than two (2) weeks to elapse between the collection of the specimen and the test being performed by Biomolecular Integrations, during which time patients had already gone through more than half of the course of medication that was prescribed.

358.   Even when a patient's urine drug test revealed an unexpected result, the defendants did not use the results or alter the patient's treatment plan, and simply continued to prescribe the same medications.

359.   For example, on September 4, 2020, Biomolecular Integrations billed Allstate for an extensive panel of definitive urine drug testing allegedly ordered by Suleiman P.C. for patient T.M. (Claim No. 0568484778).

360.   On August 21, 2020, Suleiman had prescribed T.M. a 30 day supply of the opioid Norco, as well as Flexeril, Lidopro ointment, and Lidopro patches.

361.   The results of the September 4, 2020 drug testing were positive not just for the Norco and Flexeril prescribed by Suleiman, but also for the separate opioid hydromorphone as well as for two (2) other drugs.

362.   Despite the multiple positive test results for drugs Suleiman did not prescribe, Suleiman P.C. made no mention of the test results, stated that "[n]o illicit drugs are reported," and noted the use of only diabetes pills and insulin injections by T.M., evidencing that Suleiman did not review the results of the drug testing he ordered for T.M. at all.

363.   In fact, despite the positive and unexpected urine drug test results indicating possible abuse of unprescribed medications, including additional opioids, Suleiman's treatment plan included new prescriptions for additional Flexeril tablets and 60 Norco tablets.

364.   Further demonstrating that the urine drug testing ordered by Suleiman P.C. was not medically necessary, the testing it ordered was not random and was ordered far more frequently than recommended by applicable medical and governmental guidelines for such testing.

365.   Even though Suleiman P.C. never performed a risk assessment for patients for whom it prescribed opioids, it routinely ordered urine drug testing at a rate appropriate only for or even exceeding the recommended rate of testing for patients in the highest risk category for abuse or diversion.

366.   For many patients, Suleiman P.C. ordered monthly or nearly monthly testing even when it noted no risk factors for abuse or diversion and where its evaluation of those patients found no evidence of misuse.

367.   Suleiman P.C. also ordered drug testing on patients for whom it did not prescribe opioids or other controlled substances, meaning there was no medical purpose for such testing.

368.   Urine drug tests that have no bearing on patients' treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

## 2.   Fabricated Diagnoses

369.   In order to create the appearance of necessity for its extensive and unnecessary urine drug testing, Biomolecular Integrations fabricated diagnoses on its bills and records.

370.   Nearly all of the bills submitted by Biomolecular Integrations reported that the patients had been diagnosed with International Classification of Diseases ("ICD") code Z79.891, which is "long-term (current) use of opiate analgesic."

371.   Obviously, claiming that a patient is a chronic and current user of opiates creates the appearance that it could be necessary for that patient to undergo urine drug testing.

372.   However, in reality, few patients for whom Biomolecular Integrations submitted bills were actually prescribed opiate medications at all, much less prescribed such medications on a long-term basis.

373.   For example, Biomolecular Integrations reported ICD-10 Z79.891 relative to patients S.B. (Claim No. 0548894633), M.D. (Claim No. 0584147177), and T.L. (Claim No. 0561791872) on at least eleven (11) separate occasions despite

none of these patients being prescribed any opiate medications on even a short-term basis.

374. As detailed above, the vast majority of the patients for which Biomolecular Integrations submitted bills were not prescribed any substances that would be susceptible to abuse or misuse and when they were prescribed with opiates or related drugs, they were on a short-term basis immediately following alleged procedures.

375. Biomolecular Integrations's false representations that patients were long-term and current opiate users was intended to dupe Allstate into believing that a medical justification existed for its exorbitant charges when in fact no such justification existed at all.

### 3.   Performance of Unordered and Unnecessary Definitive Drug Tests

376. Each time Suleiman P.C. or another provider ordered definitive urine drug testing from Biomolecular Integrations, Biomolecular Integrations billed for scores of different tests that were not specifically ordered by the provider and that were medically unnecessary.

377. As an initial matter, nearly all of the definitive drug testing ordered by Suleiman P.C. was improper and medically unnecessary because such definitive drug testing should only be utilized after performing a drug screen and when that

screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed.

378. This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical situations, confirmation is not always necessary. Clinical correlation is appropriate . . . . In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test. However, if the patient disputes the unexpected findings, a confirmatory test should be done."

379. Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

380. Contrary to this standard, Suleiman P.C. never performed a drug screen on patients, which typically is a test performed in the physician's office using reagent dipsticks that can be purchased for less than $1.00 and takes only seconds to perform, and instead immediately ordered definitive drug testing that permitted Biomolecular Integrations to bill Allstate thousands of dollars for each patient.

381.   The level of definitive testing Suleiman P.C. ordered during routine evaluations following low-level motor vehicle accidents significantly exceeded the level of definitive testing required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing.

382.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

383.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

384.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

385.   Thus, the NRC does not require that definitive (also known as confirmatory) testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

386.   Even when screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

387.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further definitive testing is unnecessary.

388.   Suleiman P.C.'s practice of routinely ordering definitive urine drug testing was contrary to the applicable standard of care.

389.   In fact, Biomolecular Integrations routinely billed for tests that it knew were not specifically ordered by Suleiman P.C. and other medical providers and for which no medical necessity was ever established.

390.   The automatic ordering of unnecessary drug testing was facilitated by the prescription forms Biomolecular Integrations supplied to Suleiman P.C. and other medical providers, which permitted the provider to order predetermined and not patient specific "panels" of tests.

391.   Biomolecular Integrations's template prescription form allowed providers simply to check a box for a "Confirmation Panel," which it then used to bill for dozens of different tests, with no information about why such testing was necessary or which tests were relevant to the patient's condition.

392.   The use of predetermined panels of tests that are not specific to patient needs does not comply with the applicable standard of care for such testing.

393.   Per the CDC guidelines for practitioners prescribing opioids for chronic pain, the use of definitive testing should be done based on the need to detect specific

opioids not identified through screening or in the event of the presence of unexpected screening results.

394.   Clinicians should not test for substances for which results would not affect patient management or for which implications for management are unclear.

395.   Regulations require that all diagnostic testing must be ordered by the treating physician, must be patient specific, and must be utilized in medical management of the patient's specific problem.

396.   The government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

397.   Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

398.   The Biomolecular Integrations prescription form's use of a box for a "confirmation" panel does not provide the required indication of the specific testing ordered by the practitioner, and was therefore improper.

399.   Despite including areas on its order form for providers to provide information to help establish the medical necessity for drug testing orders, Biomolecular Integrations routinely performed the same battery of testing even when these section of the form were left blank, which routinely occurred.

400.   For example, Biomolecular Integrations received an order for definitive drug testing with respect to patient A.S. (Claim No. 0556229037) on or about September 30, 2019 that included no information about point of care screening, no diagnosis codes, and did not even have a box checked for the type of testing being ordered.

401.   Biomolecular Integrations never questioned the medical necessity of the testing that was ordered with respect to patient A.S. or sought to determine what specific testing was required, and instead billed Allstate for a comprehensive panel of testing, charging more than $1,973 for 19 different tests.

402.   None of the records submitted to Allstate by the defendant clinics contain any indication that the physicians or nurse practitioners ordering drug tests made any determination as to what type of testing should be performed or what substances should be tested.

403.   Use of a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

404.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, Biomolecular Integrations knowingly billed for urine drug testing that could not have been medically necessary for each patient's individual medical condition.

405.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary" for the beneficiary, given his or her clinical condition. *See* 63 Fed. Reg. at 45079.

406.   Instead of taking steps to ensure that it was only submitting claims for necessary drug testing, Biomolecular Integrations intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

407.   Drug tests that were improperly ordered and performed could not have been used to actually guide patient care.

408.   Allstate is not required to pay the defendants for drug testing that is redundant, not patient-specific, and that is unnecessary, and is entitled to a return of monies it paid to the defendants for these medically unnecessary drug tests.

## F.   MEDICALLY UNNECESSARY AND IMPROPER DRUG PRESCRIPTIONS

409.   As part of their predetermined treatment protocol, beginning at patients' initial appointments and at each frequent follow up appointment, Suleiman and

Suleiman P.C. routinely prescribed numerous medications that were not tailored to patients' specific medical conditions and were medically unnecessary.

410. The prescriptions and frequent refills ordered by Suleiman and Suleiman P.C. were almost always also billed by Suleiman P.C., which dispensed medications from its office, meaning that Suleiman and Suleiman P.C. had a clear pecuniary incentive to prescribe as many medications as possible regardless of necessity.

411. Nearly all of Suleiman P.C.'s patients were billed for similar packages of medications, often a combination of Norco, Flexeril, and Nulido ointment and patches, or similar medications.

412. As one example of this practice, Suleiman P.C. billed Allstate $2,420.99 for a collection of prescriptions allegedly supplied to patient I.A. (Claim No. 0543261951) at a visit on August 7, 2019, and billed Allstate for refill prescriptions on ten (10) additional dates through the end of 2020.

413. Suleiman P.C. billed Allstate more than $30,898 for medications it purportedly issued to A.I. during that period but never attempted to evaluate the effectiveness of any of the medications it prescribed.

414. As another example, Suleiman P.C. billed $17,406 for medications it purportedly supplied to patient N.E. (Claim No. 0537286338) on eleven (11)

different dates in a period of less than eight (8) months between March 1, 2019 and October 25, 2019.

415.   Suleiman P.C. ordered and billed for frequent refills of the medications it prescribed, typically on a monthly basis and without assessing their effectiveness or continued medical necessity.

416.   Further demonstrating that the medications were prescribed as part of a predetermined protocol and not to address patients' actual needs, even when patients reported significant improvements and reduced pain, Suleiman and Suleiman P.C. continued to bill for refills and to prescribe new medications without explaining why they were needed.

417.   For example, an evaluation report from a purported examination of patient N.E. (Claim No. 0537286338) on May 24, 2019 indicated that Pennsaid ointment and Lidopro patches were being prescribed for N.E.'s reported neck pain and that Norco, Celebrex, and Augmentin were prescribed for pain associated with a broken finger.

418.   Subsequent reports, including from an alleged October 25, 2019 evaluation, indicated that N.E. was continuing to complain of only hand pain at that time, but Suleiman continued to prescribe, and Suleiman P.C. continued to bill for, the same collection of medications, including the Pennsaid ointment and Lidopro patches that were prescribed for alleged neck pain.

419.   Another way the defendants improperly prescribed and billed for medications was by refilling medications before the previous supply ran out (if the patient even used the previous supply, which was never confirmed or even inquired about).

420.   For example, Suleiman prescribed, and Suleiman P.C. billed for, a 30 day supply of Flexeril on August 21, 2020 to patient T.M. (Claim No. 0568484778) and then prescribed an additional 30 day supply on September 4, 2020, just 14 days later.

421.   It is inappropriate and dangerous to dispense medications to patients when they do not actually need refills.

422.   Suleiman also prescribed, and Suleiman P.C. billed for, medications that made no sense to prescribe together and could not have been used together, such as for Lidopro patches and cream at the same time to the same patient (as the cream would have no impact if rubbed on top of the patch).

423.   Allstate has no obligation to pay for medications that are prescribed as a matter of course, are not needed or used by patients, and that are medically unnecessary.

## IX.   FRAUDULENT BILLING PRACTICES

424.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

425.   The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

426.   All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT codes.

427.   By utilizing CPT Codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT Codes they utilized.  The defendants never communicated to Allstate that they intended that the CPT codes they used to submit bills were intended to have any meanings other than those ascribed by the AMA, and Allstate reasonably relied on the representations and published definitions assigned to the CPT codes billed by the defendants.

428.   Allstate reasonably relied on the defendants' utilization of CPT Codes to accurately report the services they rendered to Allstate insureds.

429.   The vast majority of the bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the

National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

430.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

431.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

432.   As detailed above, the defendants regularly double- and triple-billed Allstate for the same services associated with purported surgical and pain management injection procedures, which is a practice that is also known as fraudulent unbundling.

433.   The defendants also used the following fraudulent billing practices to further inflate charges to Allstate.

### A.   FRAUDULENT UPCODING

434.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and (3) were wholly unwarranted and unnecessary.

435. The billing codes submitted to Allstate by Suleiman P.C. and Ramakrishnan P.C. also consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Allstate.

436. Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

437. There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

438. Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; reexaminations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

439. The final number to complete each five-digit CPT code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

440. To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

441.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

442.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

443.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

444.   To warrant a medical bill demanding payment for a level 4 initial examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

445.   It is expected that the amount billed for an evaluation will vary depending on the complexity of the evaluation performed, will a higher amount charged for a higher complexity evaluation than for a low complexity evaluation.

446.   Since January 1, 2017, the vast majority of patient examination charges that both Suleiman P.C. and Ramakrishnan P.C. billed to Allstate were for level 4 and level 5 examinations.  *See* Exhibits 3 and 4.

447.   During that same period of time, Suleiman P.C. and Ramakrishnan P.C. never billed Allstate for less than a level 4 initial examination.  Id.

448.   Suleiman P.C. and Ramakrishnan P.C. also never billed Allstate for less than a level 3 reexamination.

449.   Since January 1, 2016, 100% of initial exams and 98% of reexaminations billed by Suleiman P.C. were billed as level 4 or 5 exams.  *See* Exhibit 3.

450.   Since January 1, 2016, 100% of initial exams and 76% of reexaminations billed by Ramakrishnan P.C. were billed as level 4 or 5 exams.  *See* Exhibit 4.

451.   The defendants' examinations consistently fell far short of meeting the threshold standard to bill for level 4 and level 5 encounters.

452.   The defendants routinely failed to satisfy the time component for the charge submitted, they almost never obtained comprehensive patient histories or performed detailed physical examinations, and their use of a predetermined treatment protocol for virtually every patient does not reflect decision making of moderate complexity required to bill for level 4 and 5 examinations.

453.   For example, Ramakrishnan P.C. billed Allstate $760 for a purported level 4 reexamination of patient D.Y. (Claim No. 0526210471) on July 8, 2019, but a report prepared by D.Y.'s case manager concerning that same visit indicated that Ramakrishnan "came in to evaluate client for about 10 minutes," not the 25 minutes required for a level 4 reexamination, and the report does not note that any physical examination of D.Y. was performed by Ramakrishnan at all.

454.   The reexamination of D.Y. described by his case manager does not remotely satisfy the requirements necessary to bill for a level 4 reexamination.

455.   As another example, Suleiman P.C. billed for multiple reexaminations of patient A.A. (Claim No. 0538630435), which it billed using CPT code 99214, indicating, among other things, that it obtained a comprehensive patient history, conducted a comprehensive examination, and evaluated A.A. face-to-face in an interaction lasting approximately 25 minutes.

456.   The reports from the reexaminations, however, utilize formulaic language to report only the standard cursory findings and a limited examination of A.A. that Suleiman P.C. utilized to order additional testing, continued physical therapy, and ongoing reevaluations.

457.   The defendants engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Allstate for patient appointments.

458. By creating medical bills that included CPT codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

459. However, the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT codes representing patient encounters that did not actually occur as billed.

### B. IMPROPER BILLING DURING GLOBAL POST-SURGERY PERIODS

460. Billing regulations provide that the cost of many of the surgeries and procedures billed by the defendants include all necessary services furnished before, during, and after a procedure, in what is referred to as the "global surgery package."

461. Post-surgery services include subsequent evaluations and pain management related to the surgery.

462. Periods during which post-surgery services are included in the cost of the procedure vary based on the procedure performed, but are generally either ten (10) days for relatively minor procedures or 90 days for surgeries.

463. For procedures that include a 90-day global surgery package, the global period includes the day prior to the surgery, the day of the surgery, and 90 days following the surgery.

464.   Even when there is no post-surgery period applicable to a procedure, services performed on the date of a procedure are generally not payable as a separate service.

465.   The defendants frequently improperly charged for examinations billed on the same day as purported injections and surgical procedures as well as examinations performed the day before a surgical procedure, which is included in the global period.

466.   The defendants also frequently submitted improper charges for post-operative examinations billed within the 90-day global period following a procedure.

467.   The following patients exemplify the defendants' fraudulent practice of submitting charges for examinations that are included in the global period for procedures:

    a.   Suleiman P.C. billed for an alleged open rotator cuff repair to patient A.M. (Claim No. 0397545781) on April 18, 2017, which had a global period of 90 days.  Suleiman P.C. then fraudulently billed for two (2) separate evaluations during those 90 days on May 26, 2017 and July 7, 2017, the former of which was an appointment expressly scheduled for post-operative evaluation.

    b.   Ramakrishnan P.C. billed for an alleged percutaneous implantation of a stimulator device to patient B.N. (Claim No. 0458769858) on August 3, 2017, a procedure which had a global period of ten (10) days, including the day of the procedure, and billed for a purported evaluation on the same date.

    c.   Ramakrishnan P.C. billed for an alleged spinal surgery to patient M.L. (Claim No. 0584900203) on August 6, 2020, which had a global period of 90 days.  Ramakrishnan P.C. then fraudulently

billed for an evaluation of M.L. on October 14, 2020, which was well within the global post-surgery period.

d.  Suleiman P.C. billed for an alleged shoulder arthroscopy to patient W.A. (Claim No. 0566036034) on July 21, 2020, which had a global period of 90 days.  Suleiman P.C. then billed for evaluations of W.A. on September 18, 2020 and September 30, 2020, both of which were well within the global post-surgery period and were not billable.

## X.  EXCESSIVE AND UNREASONABLE CHARGES

468.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

469.   The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

470.   In each such case, including those described in the following sections, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

471.   Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each claim thereby incurring costs.

### A.  EXCESSIVE AND UNREASONABLE CHARGES FOR OFFICE VISITS

472.   The amounts charged by the defendants for patient evaluations and reevaluations were excessive and unreasonable.

473.   For example, Ramakrishnan P.C. routinely billed Allstate between $1,163 and $1,457 for initial patient evaluations and typically billed between $750 and $1,025 for reevaluations.

474.   By way of comparison, the 2021 CMS reimbursement rate for a level 5 initial evaluation was $230.83 and for a level 5 reevaluation was $187.51, meaning the amounts charged by Ramakrishnan P.C., even if it satisfied the requirements to bill as level 5 examination which was almost never the case, were frequently more than 500% higher than the CMS reimbursement rate.

475.   A charge that is more than 500% higher than the maximum charge permitted by CMS regulations cannot be reasonable under the Michigan No-Fault Act.

476.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

477.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

478.   Ramakrishnan P.C.'s charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

479.   Allstate is not required to pay the defendants for patient evaluations that were not medically necessary, were performed for the purpose of inflating claims to Allstate, and for which they did not charge Allstate a reasonable amount.

### B.   EXCESSIVE AND UNREASONABLE CHARGES FOR SURGERIES AND INJECTIONS

480.   To the extent the surgeries, procedures, and injections billed by the defendants actually occurred, they routinely billed exorbitant and unreasonable amounts for those procedures.

481.   Epidural steroid injections and facet joint injections were one area where the defendants repeatedly billed outrageous amounts.

482.   For example, on September 11, 2019, EASC and Ramakrishnan P.C. billed for alleged lumbar epidural steroid injections and bilateral facet joint injections at three vertebral levels to patient D.Y. (Claim No. 0526210471).

483.   EASC billed Allstate $4,718 for the epidural steroid injection and Ramakrishnan P.C. billed $1,740 for that injection to D.Y.

484.   EASC also billed Allstate $16,213 for the first vertebral level bilateral facet injections, and $11,613 and $5,613 for the second and third level injections as well as $384 for an unbundled "supply charge," while Ramakrishnan P.C. billed between $2,440 and $1,226 for each facet injection and $668 for an additional unbundled charge for fluoroscopic guidance.

485.    Altogether, Allstate was billed more than $45,841 for the alleged September 11, 2019 injections to D.Y.

486.    In contrast, the CMS reimbursement rate for the Detroit area for 2021 for the same injections performed in a doctor's office were $276.99 for a lumbar epidural steroid injection, $186.07 for a first level facet injection, and $95.87 for second and third level facet injections.

487.    In other words, CMS would have paid $1,031.69 for the same injections for which the defendants billed Allstate $45,841, representing a markup of more than 4,300% by EASC and Ramakrishnan P.C.

488.    The defendants' charges for surgical procedures are similarly excessive and unreasonable.

489.    As one example, EASC and Suleiman P.C. each billed Allstate with respect to an alleged shoulder surgery on patient A.S. (Claim No. 0541603536) on October 22, 2019.

490.    EASC billed Allstate a total of $92,190 for the facility fee component, including multiple charges of between $15,000 and $17,000 for allegedly separate parts of the single alleged procedure.

491.    Suleiman P.C. submitted billing for the professional component of the procedure totaling $28,000, with individual components billed between $4,000 and $6,250.

492. One of the charges billed by the defendants was CPT code 29807 ("*Arthroscopy, shoulder, surgical; repair of SLAP lesion*"), for which EASC billed $17,804 and Suleiman P.C. billed $5,980.

493. In comparison, the CMS reimbursement amount for the physician component for that CPT Code is $1,123, meaning the charge submitted by Suleiman P.C. to Allstate was 432% higher than the CMS approved amount.

494. The defendants' facility charges are similarly excessive and unreasonable when compared to the amounts billed by other medical providers to health insurers.

495. As of January 1, 2019, the Affordable Care Act requires hospitals to publish cost lists for services offered.

496. Henry Ford Hospital, a large hospital system in the Greater Detroit Region, has published the amounts it bills insurers for many of the same procedures billed by the defendants.

497. Henry Ford Hospital lists its facility charges to insurers for the same procedure billed with respect to patient A.S., CPT code 29807, as between approximately $3,000-$8,000, meaning that EASC's bill to Allstate for facility fees for that procedure was from two (2) times to nearly six (6) times higher than the amount Henry Ford Hospital bills for the same procedure.

498.   The defendants' charges for surgical procedures and injections are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### C.   EXCESSIVE AND UNREASONABLE PRESCRIPTION DRUG CHARGES

499.   As previously described, Suleiman prescribed large numbers of medications to patients as part of the defendants' predetermined treatment protocol.

500.   In order to maximize the payments they induced Allstate to make, the defendants ensured that prescriptions for drugs written by Suleiman were almost always billed by defendant Suleiman P.C.

501.   Suleiman P.C., in turn, charged Allstate excessive and unreasonable prices for those medications, at amounts that were frequently many times the retail prices of those medications.

502.   As one example, on May 15, 2020, Suleiman prescribed patient A.A. (Claim No. 0538630435) five (5) different medications, including Celebrex, Ambien, Lidopro patches, Pennsaid, and Norco.

503.   Suleiman P.C., under its assumed name Premier Pharm, billed Allstate $3,409.37 for the five (5) medications which it allegedly provided to A.A.

504.   Had the medications prescribed to A.A. been filled by a retail pharmacy such as Walgreens or CVS, the same five (5) medications would have cost less than

$150, representing a markup by Suleiman P.C. of more than 2,172% over the retail price for those medications.

505.   Suleiman also prescribed, and Suleiman P.C. billed for, numerous refills of these medications, billing Allstate the same outrageous amounts on each occasion.

506.   The following chart lists the amounts most frequently charged by Suleiman P.C. for some of the medications it most often billed to Allstate, the average retail cost of those medications, and the percentage markup over the average retail cost by Suleiman P.C.:

| Description | Suleiman P.C. Commonly Billed Amount | Average Retail Price | Percentage Markup |
|---|---|---|---|
| Celebrex 200 mg capsule Quantity: 60 | $550.04 | $16.45 | 3,243% |
| Lidopro patches Quantity: 30 | $1,738.00 | $63.77 | 2,625% |
| Pennsaid solution 1.5% Quantity: 150 mg | $832.72 | $51.58 | 1,514% |
| Hydrocodone Bitartrate and Acetaminophen 5mg/325mg Quantity: 60 | $117.10 | $17.91 | 553% |

507.   Allstate is not required to pay the defendants for medications prescribed and dispensed for the purpose of inflating claims to Allstate or for which they did not charge Allstate a reasonable amount.

### D.   EXCESSIVE AND UNREASONABLE CHARGES FOR MRIS

508.   As previously discussed, New Clear obtained approval from DHHS to acquire and operate its MRI facility from Pearl Health Management, Inc. ("Pearl")

on October 6, 2020, even though it began unlawfully billing Allstate for performing MRIs at the facility more than a year earlier.

509. Earlier in 2020, New Clear and/or Pearl filed a statement of revenue and expense with the State of Michigan with respect to the MRI facility as part of the process of obtaining approval to operate the facility.

510. That statement of revenue represented that the MRI facility's projected cost per MRI patient visit during its first year of operation would be $457, that the average cost for the second year would be $367, and that the average cost per patient visit during the third year of operation would be $342.

511. These projections were based on a comprehensive and detailed calculation of all operating expenses for the facility, including salaries and wages, fringe benefits, rent, leased equipment costs, maintenance and repair, depreciation, interest, utilities, insurance, professional services, medical supplies, office supplies, consultant fees, and other expenses.

512. Despite a projected cost per patient visit of no more than $457, New Clear never charged Allstate less than $4,800 per MRI. *See* Exhibit 5.

513. Thus, New Clear always charged Allstate more than ten (10) times what it represented its expenses would be in order to obtain approval to operate from the State of Michigan.

514.   New Clear then sold its accounts receivable to third parties, including entities called Genesis Alternative Finance IV LLC and Funding4Doctors, LLC, for a fraction of the amount billed to Allstate.

515.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

516.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

517.   New Clear's charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

518.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

519.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products,

services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

520.  Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

521.  Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

522.  There are no less than fourteen (14) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.  SIM, Suleiman P.C., Ramakrishnan P.C., Biomolecular Integrations, and New Clear routinely billed for services that were not performed at all.

b.  New Clear unlawfully billed for MRIs without possessing the licensure or authorization required by the State of Michigan.

c.  EASC, SIM, Suleiman P.C., and Ramakrishnan P.C. each regularly billed Allstate multiple times for the same purported services.

d.  The defendants used an improper predetermined treatment protocol, implemented by use of vague findings and predetermined diagnoses to order unnecessary and excessive injections, surgical procedures, urine drug testing, medications, and diagnostic testing.

e.  The defendants ordered and pressured patients to undergo therapeutic injections and surgical procedures that were medically unnecessary and ordered in violation of applicable standards of care.

f.  Suleiman P.C. and Ramakrishnan P.C. ordered and billed for unnecessary and excessive radiological examinations in violation of applicable standards of care.

g.  Suleiman P.C. and Ramakrishnan P.C. ordered, and Suleiman P.C. billed for, excessive and unreasonable amounts of physical therapy.

h.  New Clear billed for unnecessary and excessive number of MRIs in violation of applicable standards of care.

i.  Suleiman P.C. and Ramakrishnan P.C. unnecessarily performed injections and other procedures utilizing EASC and SIM surgical suites.

j.  Suleiman P.C. billed for medically unnecessary prescription medications that had no basis or appropriate use.

k.  Suleiman P.C. ordered and Biomolecular Integrations billed for medically unnecessary definitive urine drug testing in violation of applicable standards of care.

l.  Suleiman P.C., Ramakrishnan P.C., EASC, and SIM submitted bills using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice called unbundling.

m. Suleiman P.C. and Ramakrishnan P.C. submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice called upcoding.

n.  Suleiman P.C., Ramakrishnan P.C., EASC, and New Clear submitted bills at rates that had no basis and were many times higher than was reasonable to charge for services, if such services were rendered at all.

523.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

524.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

525.   The foregoing facts – including billing for services not rendered, falsifying medical records, billing for treatment without a license, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

526.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

527.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 6.

528.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the

treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

529.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

530.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, medications, DME, facility fees, and ancillary services for which they billed Allstate.

531.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

**B.   ALLSTATE'S JUSTIFIABLE RELIANCE**

532.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

533.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

534.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

535.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

536.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

537.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

538.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

539.   As a result, Allstate has paid in excess of $2,240,264 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

540.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

541.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 6, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

542.   This objective necessarily required the submission of bills for payment to Allstate.

543.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

544.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the

106

insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

545.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

546.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

547.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

548.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

549.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

550.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

551.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 7.

552.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

553.   It was within the ordinary course of business for EASC, SIM, Suleiman P.C., Ramakrishnan P.C., Biomolecular Integrations, and New Clear to submit claims for No-Fault payment to insurance carriers like Allstate through faxes and the U.S. Mail.

554.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

555.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the entity defendants.

556.   The entity defendants, at the direction and with the knowledge of their owners and managers (including defendants Suleiman and Ramakrishnan), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

557.   Thus, the defendants' commission of mail and wire fraud continues.

558.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

559.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

560.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 6 annexed hereto and identified in the exemplar claims above.

561.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.  DAMAGES

562.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

563.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $2,240,264.

564.   Exhibit 8 (EASC), Exhibit 9 (SIM), Exhibit 10 (Suleiman P.C.), Exhibit 11 (Ramakrishnan P.C.), Exhibit 12 (New Clear), and Exhibit 13 (Biomolecular Integrations) annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

565.   Allstate's claim for compensatory damages, as set out in Exhibits 8 through 13, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

566.   Every payment identified in Exhibits 8 through 13 was made by Allstate alone.

567.   Moreover, every payment identified in Exhibits 8 through 13 derives from a check sent by Allstate to the defendants through the U.S. Mail.

568.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

569.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

570.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (EASC Enterprise)
### Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.

571.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

572.   EASC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

573.   In connection with each of the claims identified in the within Complaint, defendants Suleiman P.C., Ramakrishnan P.C., New Clear, Suleiman, and Ramakrishnan ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by EASC, or knew that such false medical documentation would be faxed and mailed in the ordinary course of EASC's

business, or should have reasonably foreseen that the mailing of such false medical documentation by EASC would occur, in furtherance of the Count I defendants' scheme to defraud.

574.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

575.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by EASC, which they knew would be billed by EASC, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

576.   Ramakrishnan owned, managed, and controlled EASC and was responsible for all actions taken by EASC and its staff.

577.   Suleiman P.C., Ramakrishnan P.C., Suleiman, and Ramakrishnan were responsible for ordering medically unnecessary surgeries, injections, and procedures and arranging for those unnecessary surgeries, injections, and procedures to be performed at EASC in order to allow EASC to submit bills to Allstate for medically unnecessary facility fees.

578.   New Clear billed for unnecessary MRIs that were used to create the appearance of medical necessity for the procedures billed by EASC.

579.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted EASC to continue billing for unlawful and medically unnecessary facility fees.

580.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to EASC for the benefit of the Count I defendants that would not otherwise have been paid.

581.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

582.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT II**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(EASC Enterprise)**
**Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.**

583.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

584.   Defendants Suleiman P.C., Ramakrishnan P.C., New Clear, Suleiman, and Ramakrishnan ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of EASC.

585.   The Count II defendants each agreed to further, facilitate, support, and operate the EASC enterprise.

586.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

587.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of EASC even though EASC was not eligible to collect such payments by virtue of its unlawful conduct.

588.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

114

589.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

590.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (SIM Enterprise)
### Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.

591.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

592.   SIM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

593.   In connection with each of the claims identified in the within Complaint, defendants Suleiman P.C., Ramakrishnan P.C., Suleiman, and Ramakrishnan ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by SIM, or knew that such false medical documentation would be faxed and mailed in the ordinary course of SIM's business,

or should have reasonably foreseen that the mailing of such false medical documentation by SIM would occur, in furtherance of the Count III defendants' scheme to defraud.

594.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

595.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by SIM, which they knew would be billed by SIM, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

596.   Suleiman owned, managed, and controlled SIM and was responsible for all actions taken by SIM and its staff.

597.   Suleiman P.C., Ramakrishnan P.C., Suleiman, and Ramakrishnan were responsible for ordering medically unnecessary surgeries, injections, and procedures and arranging for those unnecessary surgeries, injections, and procedures to be performed at SIM in order to allow SIM to submit bills to Allstate for medically unnecessary facility fees.

598.    The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted SIM to continue billing for unlawful and medically unnecessary facility fees.

599.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to SIM for the benefit of the Count III defendants that would not otherwise have been paid.

600.    The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

601.    By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (SIM Enterprise)
### Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.

602.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

117

603.    Defendants Suleiman P.C., Ramakrishnan P.C., Suleiman, and Ramakrishnan ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of SIM.

604.    The Count IV defendants each agreed to further, facilitate, support, and operate the SIM enterprise.

605.    As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

606.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of SIM even though SIM was not eligible to collect such payments by virtue of its unlawful conduct.

607.    The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

608.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

609.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Suleiman P.C. Enterprise)
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; New Clear Images, LLC; Biomolecular Integrations, Inc.; and Jiab Suleiman, D.O.**

610.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

611.   Suleiman P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

612.   In connection with each of the claims identified in the within Complaint, defendants EASC, SIM, New Clear, Biomolecular Integrations, and Suleiman ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Suleiman P.C., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Suleiman P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Suleiman P.C. would occur, in furtherance of the Count V defendants' scheme to defraud.

613.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

614.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Suleiman P.C., which they knew would be billed by Suleiman P.C., in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

615.   Suleiman owned, managed, and controlled Suleiman P.C. and was responsible for all actions taken by Suleiman P.C. and its staff.

616.   EASC and SIM were responsible for supplying goods and services and facilities for medically unnecessary treatment ordered by Suleiman P.C. that allowed Suleiman P.C. to submit bills to Allstate for medically unnecessary procedures.

964.   New Clear and Biomolecular Integrations received patient referrals from Suleiman P.C. and billed Allstate for medically unnecessary testing ordered by Suleiman P.C. that was used to create the appearance that Suleiman P.C. was performing lawful and necessary treatment to the patients at issue herein and that gave the false appearance that patients needed treatment from Suleiman P.C. that allowed Suleiman P.C. to continue billing Allstate.

617.   The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of

injury and permitted Suleiman P.C. to continue billing for unlawful and medically unnecessary treatment, if provided at all.

618.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Suleiman P.C. for the benefit of the Count V defendants that would not otherwise have been paid.

619.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

620.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Suleiman P.C. Enterprise)
### Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; New Clear Images, LLC; Biomolecular Integrations, Inc.; and Jiab Suleiman, D.O.

621.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

622.   Defendants EASC, SIM, New Clear, Biomolecular Integrations, and Suleiman ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Suleiman P.C.

623.   The Count VI defendants each agreed to further, facilitate, support, and operate the Suleiman P.C. enterprise.

624.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

625.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Suleiman P.C. even though Suleiman P.C. was not eligible to collect such payments by virtue of its unlawful conduct.

626.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

627.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

628.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to

recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Ramakrishnan P.C. Enterprise)**
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; and Rakesh Ramakrishnan, M.D.**

629.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

630.   Ramakrishnan P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

631.   In connection with each of the claims identified in the within Complaint, defendants EASC, SIM, and Ramakrishnan ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Ramakrishnan P.C., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Ramakrishnan P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Ramakrishnan P.C. would occur, in furtherance of the Count VII defendants' scheme to defraud.

632.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

633.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Ramakrishnan P.C., which they knew would be billed by Ramakrishnan P.C., in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

634.   Ramakrishnan owned, managed, and controlled Ramakrishnan P.C. and was responsible for all actions taken by Ramakrishnan P.C. and its staff.

635.   EASC and SIM were responsible for supplying goods and services and facilities for medically unnecessary treatment ordered by Ramakrishnan P.C. that allowed Ramakrishnan P.C. to submit bills to Allstate for medically unnecessary procedures.

636.   The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Ramakrishnan P.C. to continue billing for unlawful and medically unnecessary treatment, if provided at all.

637.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Ramakrishnan P.C. for the benefit of the Count VII defendants that would not otherwise have been paid.

638.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

639.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT VIII**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Ramakrishnan P.C. Enterprise)**
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; and Rakesh Ramakrishnan**

640.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

641.   Defendants EASC, SIM, and Ramakrishnan ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Ramakrishnan P.C.

642.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Ramakrishnan P.C. enterprise.

643.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

644.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Ramakrishnan P.C. even though Ramakrishnan P.C. was not eligible to collect such payments by virtue of its unlawful conduct.

645.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

646.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

647.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Clear Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

648.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

649.   New Clear constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

650.   In connection with each of the claims identified in the within Complaint, defendants Suleiman P.C. and Suleiman ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by New Clear, or knew that such false medical documentation would be faxed and mailed in the ordinary course of New Clear's business, or should have reasonably foreseen that the mailing of such false medical documentation by New Clear would occur, in furtherance of the Count IX defendants' scheme to defraud.

651.   The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

652.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for MRIs that were purportedly performed by New Clear,

which they knew would be billed by New Clear in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

653.   Suleiman P.C. and Suleiman prescribed medically unnecessary MRIs for the patients at issue herein which were necessary in order for New Clear to submit bills to Allstate.

654.   Suleiman P.C. and Suleiman also billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that New Clear's MRIs were medically necessary and used to guide patient treatment, and directed patients to present for office visits that led to prescriptions for the MRIs billed by New Clear.

655.   The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted New Clear to continue billing for unlawful and medically unnecessary MRIs, if provided at all.

656.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to New Clear for the benefit of the Count IX defendants that would not otherwise have been paid.

657.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

658.    By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Clear Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

659.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

660.    Defendants Suleiman P.C. and Suleiman ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Clear.

661.    The Count X defendants each agreed to further, facilitate, support, and operate the New Clear enterprise.

662.    As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

663.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of New Clear even though New Clear was not eligible to collect such payments by virtue of its unlawful conduct.

664.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including ordering unnecessary MRIs from New Clear and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

665.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

666.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Biomolecular Integrations Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

667.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

668.   Biomolecular Integrations constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

669.   In connection with each of the claims identified in the within Complaint, defendants Suleiman P.C. and Suleiman ("Count XI defendants")

intentionally caused to be prepared, faxed, and mailed false medical documentation by Biomolecular Integrations, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Biomolecular Integrations's business, or should have reasonably foreseen that the mailing of such false medical documentation by Biomolecular Integrations would occur, in furtherance of the Count XI defendants' scheme to defraud.

670.   The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 7.

671.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical goods and services that were purportedly provided by Biomolecular Integrations, which they knew would be billed by Biomolecular Integrations in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

672.   Suleiman and Suleiman P.C. were responsible for the orders for urine drug testing that allowed Biomolecular Integrations to submit bills to Allstate for medically unnecessary urine drug testing.

673.   Suleiman P.C. billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that urine drug testing billed by Biomolecular Integrations was medically necessary.

674.   The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Biomolecular Integrations to continue to bill for unlawful and medically unnecessary urine drug testing, if performed at all.

675.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Biomolecular Integrations for the benefit of the Count XI defendants that would not otherwise have been paid.

676.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

677.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Biomolecular Integrations Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

678.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

679.  Defendants Suleiman P.C. and Suleiman ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of Biomolecular Integrations.

680.  The Count XII defendants each agreed to further, facilitate, support, and operate the Biomolecular Integrations enterprise.

681.  As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

682.  The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Biomolecular Integrations even though Biomolecular Integrations was not eligible to collect such payments by virtue of its unlawful conduct.

683.  The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including ordering unnecessary urine drug testing and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

684.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

685.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**COMMON LAW FRAUD**
**Against All Defendants**

686.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

687.   The scheme to defraud perpetrated by EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, Biomolecular Integrations, Suleiman, and Ramakrishnan ("Count XIII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

688.   The misrepresentations of fact made by the Count XIII defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

689.  The Count XIII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

690.  The misrepresentations were intentionally made by the Count XIII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

691.  The Count XIII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

692.  Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

693.  As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

### COUNT XIV
### CIVIL CONSPIRACY
### Against All Defendants

694.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

695.   Defendants EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, Biomolecular Integrations, Suleiman, and Ramakrishnan ("Count XIV defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

696.   The Count XIV defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

697.   This purpose was known to all of the Count XIV defendants and intentionally pursued.

698.   Indeed, as detailed above, the Count XIV defendants engaged in inter-referrals to each other of patients for unnecessary treatment and testing so that each could submit improper bills to Allstate.

699.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and

because they engaged in fraudulent billing practices, the Count XIV defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

700. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

701. All of the Count XIV defendants directly benefited from the payments made to EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, and Biomolecular Integrations.

702. All of the Count XIV defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XIV defendants in the commission of acts done for the benefit of all Count XIV defendants and to the unjustified detriment of Allstate.

703. Accordingly, all of the Count XIV defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT XV**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; and Biomolecular Integrations, Inc.**

704. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

137

705.   Allstate paid the amounts described herein and itemized in Exhibits 8 through 13 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, and Biomolecular Integrations ("Count XV defendants").

706.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XV defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

707.   The Count XV defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

708.   Allstate is entitled to restitution from each of the Count XV defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

709.   The Count XV defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT XVI**
**UNJUST ENRICHMENT**
**Against All Defendants**

710.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

711.   Defendants EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, Biomolecular Integrations, Suleiman, and Ramakrishnan ("Count XVI defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

712.   Allstate's payments constitute a benefit which the Count XVI defendants aggressively sought and voluntarily accepted.

713.   The Count XVI defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

714.   The Count XVI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT XVII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

715.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 570 set forth above as if fully set forth herein.

716.   Defendants EASC, SIM, Suleiman P.C., Ramakrishnan P.C., New Clear, Biomolecular Integrations, Suleiman, and Ramakrishnan ("Count XVII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

717.   The Count XVII defendants also billed for services not rendered.

718.   The Count XVII defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

719.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

720.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

721.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.   Mich. Comp. Laws §§ 500.3157(1).

722.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

723.   The Count XVII defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

724.   The Count XVII defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XVII defendants for any or all of the reasons set out in the within Complaint.

725.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

726.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

727.   As such, the Count XVII defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

728.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company respectfully pray that judgment enter in their favor as follows:

## COUNT I
## VIOLATION OF 18 U.S.C. § 1962(c)
### (EASC Enterprise)
**Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (EASC Enterprise)
**Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (SIM Enterprise)
### Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (SIM Enterprise)
### Against Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; Jiab Suleiman, D.O.; and Rakesh Ramakrishnan, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Suleiman P.C. Enterprise)**
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; New Clear Images, LLC; Biomolecular Integrations, Inc.; and Jiab Suleiman, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Suleiman P.C. Enterprise)**
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; New Clear Images, LLC; Biomolecular Integrations, Inc.; and Jiab Suleiman, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Ramakrishnan P.C. Enterprise)
### Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; and Rakesh Ramakrishnan, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Ramakrishnan P.C. Enterprise)
### Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; and Rakesh Ramakrishnan, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Clear Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Clear Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

147

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Biomolecular Integrations Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Biomolecular Integrations Enterprise)
### Against Jiab Suleiman D.O., P.C. and Jiab Suleiman, D.O.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT XIII
### COMMON LAW FRAUD
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

### COUNT XIV
### CIVIL CONSPIRACY
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

### COUNT XV
### PAYMENT UNDER MISTAKE OF FACT
**Against Executive Ambulatory Surgical Center, LLC; The Surgical Institute of Michigan, LLC; Jiab Suleiman D.O., P.C.; Rakesh Ramakrishnan, M.D., P.C.; New Clear Images, LLC; and Biomolecular Integrations, Inc.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XVI
## UNJUST ENRICHMENT
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)    DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Executive Ambulatory Surgical Center, LLC, The Surgical Institute of Michigan, LLC, Jiab Suleiman D.O., P.C., Rakesh Ramakrishnan, M.D., P.C., New Clear Images, LLC, Biomolecular Integrations, Inc., Jiab Suleiman, D.O., and Rakesh Ramakrishnan, M.D., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that Executive Ambulatory Surgical Center, LLC, The Surgical Institute of Michigan, LLC, Jiab Suleiman D.O., P.C., Rakesh Ramakrishnan, M.D., P.C., New Clear Images, LLC, Biomolecular Integrations, Inc., Jiab Suleiman, D.O., and Rakesh Ramakrishnan, M.D., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits,

any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Executive Ambulatory Surgical Center, LLC, The Surgical Institute of Michigan, LLC, Jiab Suleiman D.O., P.C., Rakesh Ramakrishnan, M.D., P.C., New Clear Images, LLC, Biomolecular Integrations, Inc., Jiab Suleiman, D.O., and Rakesh Ramakrishnan, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.    <u>**DEMAND FOR JURY TRIAL**</u>

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  June 8, 2022          *Attorneys for Allstate*